**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHNNY A. JOHNSON, | ) | |
| | ) | |
| *Petitioner,* | ) | Case No. _____ |
| | ) | |
| v. | ) | CAPITAL HABEAS |
| | ) | |
| DAVID VANDERGRIFF, WARDEN | ) | ***Pending Execution Date:*** |
| | ) | ***August 1, 2023 (6:00 PM)*** |
| *Respondent.* | ) | |

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY UNDER 28 U.S.C. § 2254 RAISING RIPE CLAIM OF INCOMPETENCY TO BE EXECUTED UNDER *FORD V. WAINRIGHT*, *PANETTI V. QUARTERMAN*, AND *MADISON V. ALABAMA***

KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 E. Gregory Blvd.
Kansas City, MO 64114
816-363-4400 • Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

Daniel E. Kirsch, E.D. Mo. Bar No. 57022MO,
Mo. Bar No. 57022
Meredith Schlacter, Ny. Bar No. 5321625
Laurence E. Komp, Mo. Bar. No. 40446
Mandi Schenley, Oh. Bar No. 0102596
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-471-8282
daniel_kirsch@fd.org
meredith_schlacter@fd.org
laurence_komp@fd.org
mandi_schenley@fd.org

*Attorneys for Johnny A. Johnson*

1

Petitioner Johnny A. Johnson is scheduled to be executed by the State of Missouri on August 1, 2023. He is currently incarcerated at the Potosi Correctional Center in the custody of respondent, Warden David Vandergriff. Because Mr. Johnson does not rationally understand the reason for his execution and believes Satan is using the State of Missouri to execute him to bring about the end of the world, which the voice of Satan has confirmed to him, he is not competent to be executed and carrying out the execution would violate the Eighth and Fourteenth Amendments to the United States Constitution. U.S. Const. amends. XIII, XIV; *Madison v. Alabama*, 139 S. Ct. 718, 722 (2019); *Panetti v. Quarterman,* 551 U.S. 930, 959-60 (2007); *Ford v. Wainwright,* 477 U.S. 399, 417 (1985).

Mr. Johnson has met the required substantial threshold showing that he does not have a rational understanding of the reasons for his execution, and the Constitution entitles him to "a 'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U.S. at 949 (citing *Ford*, 477 U.S. at 424, 426). Moreover, in its response to Mr. Johnson's petition for habeas corpus filed in the Missouri Supreme Court, the State disputed the factual basis of Mr. Johnson's claim and further created a need for a full and fair hearing by submitting an affidavit from a non-expert, a lay staff member at the prison. Nevertheless, without giving Mr. Johnson an opportunity to be fully and fairly heard on the factual dispute created by the State, the Missouri Supreme Court denied his petition over dissent, holding that he had not established the requisite threshold showing of incompetency while also making factual findings and credibility determinations as to the evidence submitted. *State ex rel. Johnson v. Vandergriff*, Case No. SC100077 (June 8,

2

2023). One judge dissented from the Missouri Supreme Court's decision. *Id.* The majority decision was both legally and factually unreasonable because the court applied circular reasoning, resolving factual disputes and making credibility findings on the merits of the incompetency claim to support its conclusion that Mr. Johnson did not make a threshold showing of insanity, while simultaneously misconstruing and misstating the factual record before it.

Mr. Johnson properly and promptly pursued the state habeas remedy, filing his petition less than 30 days after the Missouri Supreme Court set the execution date, when the question of his incompetency to be executed became ripe. *State ex rel. Middleton v. Terry Russell*, 435 S.W.3d 83, 83 (Mo. banc 2014); *see also Davis v. Kelley*, 854 F.3d 967, 971 (8th Cir. 2017) ("*Ford* and its progeny focus on the inmate's competency at the time of execution," meaning "the issue of 'competency to be executed' is not ripe until execution is imminent.") (citing *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998)); *Nooner v. Norris*, 499 F.3d 831, 834 (8th Cir. 2007) (citing *Panetti*, 551 U.S. at 942; *Martinez-Villareal*, 523 U.S. at 643). The Missouri Supreme Court acted in a manner that unreasonably applied clearly established federal law and the facts before it.

## PROCEDURAL HISTORY

Mr. Johnson is a state prisoner under sentence of death. He is currently incarcerated at the Potosi Correctional Center in Mineral Point, Missouri. Mr. David Vandergriff is the Warden of Potosi Correctional Center and therefore has custody over Mr. Johnson.

3

Mr. Johnson was convicted in 2005 in the Circuit Court of St. Louis County, Missouri, of first-degree murder for the July 26, 2002, murder of Casey Williamson in Valley Park, Missouri. Mr. Johnson filed his petition for writ of habeas corpus in the United States District Court for the Eastern District of Missouri under case number 4:13-cv-00278-HEA on January 28, 2014, raising 11 grounds for relief. ECF Doc. 11. The District Court denied relief and Mr. Johnson's request for an evidentiary hearing on February 28, 2020, and denied a certificate of appealability ("COA"). *Johnson v. Steele*, 2020 WL 978038 (E.D.Mo. Feb. 28, 2020). The Eighth Circuit Court of Appeals also denied a COA; thus, there was no appellate review. *Johnson v. Blair*, 2022 WL 2032929 (8th Cir. Jan. 21, 2022). The U.S. Supreme Court denied certiorari. *Johnson v. Blair*, 143 S. Ct. 430 (Mem) (2022).

On April 19, 2023, the Supreme Court of Missouri granted the State's motion to set an execution date. The court scheduled Mr. Johnson's execution for August 1, 2023, at 6:00 p.m. On May 16, 2023, Mr. Johnson filed a petition for writ of habeas corpus in the Missouri Supreme Court raising the newly ripened claim that his execution would violate the Eighth and Fourteenth Amendments of the Constitution because he lacks a rational understanding of the reason for the execution, rendering him incompetent to be executed ("*Ford* claim"). On May 17, 2023, Mr. Johnson filed a motion for a stay of execution in the Missouri Supreme Court under the same case number. The State filed suggestions in opposition to the petition and motion for stay on May 24, 2023, and Mr. Johnson filed his reply on May 30, 2023.

Over a dissent, the Missouri Supreme Court denied the merits of Mr. Johnson's *Ford* claim on June 8, 2023. *State ex rel. Johnson v. Vandergriff*, Case No. SC100077 (June 8, 2023). The court further ruled that no petitions for rehearing could be filed in this matter. *Id.* Petitioner fully exhausted the *Ford* claim before the Missouri Supreme Court. It is an undisputed principle of law that Petitioner's newly ripened *Ford* claim is not a second or successive request for relief; filing in this Court is therefore appropriate. *Panetti*, 551 U.S. at 942; *Martinez-Villareal*, 523 U.S. 637, 641-46 (1998); *Davis*, 854 F.3d at 971; *Nooner*, 499 F.3d at 834; *see also Morgan v. Javois*, 744 F.3d 535, 537-38 (8th Cir. 2013). This is a first petition and should be treated as such. *See Lonchar v. Thomas*, 517 U.S. 314, 321 (1996).

Because this petition is being brought on June 30, 2023, it is being filed well within one year of the June 8, 2023 final state court determination being challenged and is therefore timely under 28 U.S.C. § 2244(d)(1). Furthermore, the claim did not ripen until the Missouri Supreme Court set the execution date on April 19, 2023. The filing of the *Ford* claim tolled the federal statute of limitations clock, on May 16, 2023. More than 300 days remain under the federal statute of limitations.

## RELEVANT FACTS

### A.   Mr. Johnson fixedly and irrationally believes Satan is using the State of Missouri to execute him to bring about the end of the world.

Mr. Johnson was evaluated on February 24, 2023, by neuropsychiatrist Dr. Bhushan Agharkar, M.D. Dr. Agharkar concluded that Mr. Johnson—due his irrational delusions—does not have a rational understanding of the basis for his execution. Pet.

R.91 Ex. 1 (Report of Dr. Bhushan Agharkar) at 54. Specifically, Mr. Johnson's understanding of the reason for his execution is "that Satan is using the State of Missouri to execute him to bring about the end of the world[.]" *Id.* Mr. Johnson has confirmed this to be the reason because the voice of Satan has told him so. *Id.*

Mr. Johnson has suffered from severe mental illness and cognitive impairments all his life. *Id.* at 9-49, 53. During Dr. Agharkar's evaluation, Mr. Johnson exhibited a "combination of conditions" including "an extensive delusional belief system involving paranoid, grandiose, and bizarre beliefs." *Id.* at 54. Mr. Johnson suffers from "disorganized thought processes and thought blocking. His beliefs about why he is to be executed are rooted in delusional thinking, the product of a severe psychotic mental illness and a cognitively impaired brain." *Id.* at 53. Furthermore, "[h]is brain damage/dysfunction does not allow him to rationally weigh and deliberate or reason through his decisions and thinking." *Id.* at 54. As a result of this combination of conditions, Mr. Johnson's "understanding of the reason for his execution—that Satan is using the State of Missouri to execute him to bring about the end of the world—is irrational." *Id.*

Dr. Agharkar's evaluation shows that "this irrational understanding is further demonstrated by his belief that he potentially can change this plan by going into the judge and lawyers' heads or that the spirits of the underworld can influence the State to not execute him for Satan's purposes." *Id.* Mr. Johnson also has "delusional beliefs regarding his ability to live on after death in an animal's mind or as the undead[, which] are

6

particularly troubling and indicate a lack of rational awareness of the finality of his punishment." *Id.*

Dr. Agharkar concluded that by virtue of his severe psychotic mental illness and a cognitively impaired brain, Mr. Johnson "does not have a rational understanding of the reasons for his execution" and "is incompetent to be executed." *Id.*

**B.      Mr. Johnson has a long history of psychiatric admissions, suicide attempts, and ineffective use of medications in controlling his mental illness.**

Mr. Johnson has an extensive history of suffering from mental illness and seeking treatment for it. Numerous medications and attempts to treat this severe and biologically based brain disease will be discussed below. This history establishes three things: one, the presence and persistence of the disease over time including when he was a child; two, the resistance and impervious nature of the disease to medical attempts to treat it,; and three, the historical basis refutes any suggestion of malingering.

Turning to attempts to medicinal interventions, the lengthy list of medications prescribed to him for treatment demonstrate the resistance to treatment of Mr. Johnson's schizophrenia. The lengthy list of medications include the following:

> **1992**
> Prozac 20mg
> Tofranil (Impramine)
> **1995**
> Prozac 20mg
> Vistaril 50mg
> **1996**
> Haldol 5mg and 10mg
> Thiamine 100mg
> Paxil 20mg
> Mellaril 25mg

Vistaril 50mg
**1998**
Paxil 20mg
Lorazepam .5mg, 1mg, 2mg
Chlorpromazine 50mg and 100mg
Risperdal 1,2, and 5mg
Thorazine 150mg
**2001**
Effexor 20mg
Olanzapine 10mg, 15mg
Lorazepam 2mg
Paxil 20mg
Trazodone 10mg and 100mg
**2002**
Lorazepam 2mg
Zyprexa 10mg
Trazodone 100mg
Zoloft 50mg
Tofranil 75mg
**2003**
Zyprexa 10mg and 20mg
Prozac 20mg
Loxapine 10mg and 25mg
Zoloft 50mg
Cogentin 0.5mg
Amitriptyline 50mg, 75mg and 100mg
Perphenazine 2mg
Chlorpromazine 50mg and 100mg
**2004**
Amitriptyline 100mg
Chlorpromazine 100mg, 200mg, and 300mg
Propranolol 20mg
Lithium Carbonate 300mg
Thiothixene 10mg
Tofranil 50mg
Haloperidol injection, 5mg
Klonopin 1mg
Valium 5mg and 10mg
Seroquel 100mg
**2005**
Seroquel 100mg, 400mg, 600mg
Lexapro 10mg
Propranolol 10mg

Valium 10mg
Tofranil 50mg and 100mg
Thiothixene 10mg, 20mg and 40mg
Celexa 10mg
**2006**
Celexa 10mg
Seroquel 200mg and 600mg (one in am and one in pm)
Perphenazine 8mg 2x/day
Cogentin 2mg
Benztropine 2mg 2x/day
Trihexyphenidyl 2mg
Paxil 10mg
**2007**
Clonidine 0.3mg
Mirtazapine 15mg
Desipramine 50mg
Ziprasidone 40mg
**2008**
Perphenazine 2mg, 8mg and 10mg
Clonidine 0.2mg, 0.4mg (for nightmares)
Mirtazapine 15mg and 30mg
Ziprasidone 60mg and 80mg
Tofranil 50mg
Benztropine 2mg
Cogentin 2mg
**2009, 2010**
Cogentin 2mg
Clonidine 0.2mg and 0.4mg
Mirtazapine 30mg
Perphenazine, 4mg and 10mg
Ziprasidone, 60mg, 80mg and 120mg
Benztropine 2mg
Olanzapine, 5mg
Chlorpromazine 100mg
**2011**
Ziprasidone, 40mg
Olanzapine 5mg and 10mg
Clonidine 0.2 mg
Benztropine 4mg
Perphenazine 8mg
Cogentin 4mg
Tofranil 50mg
**2012**

Olanzapine 10mg
Benztropine 2mg
Clonidine 0.2mg
Perphenazine 8mg
**2013**
Olanzapine 10mg, 15mg, and 20mg
Clonidine 0.3mg
Amitriptyline 25mg and 50mg
**2014, 2015**
Olanzapine 20mg
Vistaril 50mg
Hydroxyzine 50mg
**2016**
Olanzapine 20mg
Loxapine 10mg
Hydroxyzine 50mg
Cogentin 1mg
**2017, 2018, 2019**
Benztropine 2mg
Olanzapine 10mg and 20mg
Loxapine 10mg, 25mg, 50mg and 100mg
Cogentin 1mg
Thiothixene 10mg
**2020**
Thiothixene 5mg and 10mg
Olanzapine 5mg and 10mg
Benztropine .5mg and 1mg
Clonidine 0.1mg, 0.2mg and 0.3mg
Cogentin 0.5mg
Propranolol 10mg
Oxcarbazepine 300mg
**2021**
Abilify 15mg, 20mg and 30mg (for psychosis)
Clonidine 0.3 mg and 0.3+0.1mg (for anxiety and anger)
Navane 5mg
Thiothixene 0.5mg
Benztropine 0.5mg
**2022**
Lithium Carbonate 150mg
Benztropine 0.5 mg
Clonidine 0.3mg+0.1mg
Abilify 30mg

Cogentin 0.5mg
Lamotrigine 25mg, 50mg, 100mg

Pet. R.91 Ex. 1 at 18-21; Pet. R.91 Ex. 7 (2003-03-14 St. John's Mercy Records) at 252.

Just as lengthy as the list of medications are the documented admissions by professionals to address Mr. Johnson's burgeoning schizophrenia. Mr. Johnson's first admission to a psychiatric clinic was when he was 14 years old. By the time Mr. Johnson was 18 years old, he had been admitted for psychiatric care due to suicidal ideation, suicide attempts, threats, and gestures, four times. Pet. R.91 Ex. 7 at 718-23, 26, 30, 57, 78-79, 81, 251-59, 253-54, 257, 259, 301-03, 324, 348, 360-65, 386. In addition, he was treated in the emergency room and received 12 stitches on his left wrist; he later admitted it was a suicide attempt. *Id.* at 8, 11-13, 304, 353, 360. After he turned 18, he continued to experience symptoms of his severe, debilitating mental illness. The numerous instances are documented in reports from his hospitalizations and treatment in carceral settings and will be discussed more fully below.

Mr. Johnson turned 14 one-month prior to his first psychiatric hospitalization on April 23, 1992. *Id.* at 251, 253-54, 257, 324. He was admitted to St. John's Mercy due to a suicidal gesture. He had been thinking about killing himself for **six** months. *Id.* at 324. Dr. Alberto Soto diagnosed him with Depression and Attention Deficit Disorder with Dyslexia and ordered Tofranil (Imipramine) and Benadryl at bedtime. *Id.* at 252, 254, 263.

A mere 11 days later, on May 13, 1992, St. John's Mercy Medical Center again admitted Mr. Johnson. *Id.* at 78-79. Mr. Johnson "was hospitalized through the

emergency room for depression and taking a serious overdose with his Imipramine tablets." *Id.* at 79. He reported, "I overdosed on Imipramine because I wanted to die." *Id.* at 81. Mr. Johnson was in the ICU for a couple of days before he was transferred to the psychiatric unit. *Id.* Mr. Johnson "was severely depressed, had psychomotor retardation, [and was] wishing to be dead." *Id.* at 79. Mr. Johnson was having nightmares about his mother's boyfriend wanting to drown him. *Id.* at 81. When Mr. Johnson was five years old, the same boyfriend tried to down him when he was intoxicated. *Id.*

Dr. Khawla Khan diagnosed him with Major Depression, single episode, severe, without psychosis, and noted a serious suicide attempt. *Id.* at 83. During treatment, he disclosed he was sexually abused by "Jermaine" when he was five years old. *Id.* at 88. During family therapy with a social worker, Mr. Johnson's mom reported that the boyfriend was out of the house and would not be around them anymore. *Id.* Mr. Johnson was discharged on May 29, 1992, and was prescribed 20 mg of Prozac. *Id.* at 79-80, 91.

Still only a 14-year-old, Comtrea Community Treatment Center records reflect Mr. Johnson was treated from May 30, 1992, to October 20, 1992. Pet. R.91 Ex. 8 (Johnny Johnson miscellaneous records) at 287-90. Mr. Johnson said he attempted suicide because he feared his mother's boyfriend, who was an alcoholic and moved into their home in February of 1992. *Id.* at 288. Mick, the boyfriend, moved out of the home after Mr. Johnson's second hospitalization. *Id.* at 289. Mr. Johnson appeared to function better while taking the antidepressants prescribed for him when he was hospitalized. *Id.* at 290. When discharged, the diagnosis was Major Depression, single episode, in partial remission. *Id.* at 287.

12

On November 19, 1993, when Mr. Johnson was 15 years old and in the eighth grade, he was again admitted to St. John's Mercy Medical Center. Ex. 7 at 20-21. He was admitted to the ER after becoming upset with a teacher and threatening suicide. *Id.* at 18-19, 22-23, 26. He was diagnosed with Major Depression, recurrent type. *Id.* at 17-19, 57. His mother also reported Mr. Johnson drew pictures of a head with a gun on it two days before the admission. *Id.* at 20. Dr. Narendir T. Soorya recommended a **four-week** stay for psychotherapy, group therapy, activity therapy, and appropriate medications. *Id.* at 21. Even though the doctor recommended a longer stay, Mr. Johnson was discharged **less than a week later** on November 25, 1993. *Id.* at 18-19, 30.

On May 26, 1995, when Mr. Johnson was 17, he cut his wrist. *Id.* at 8, 11-12. He claimed was an accident because he was "fooling around [with] a razor blade." *Id.* He was treated in the emergency room at St. John's Mercy and released. *Id.* It required 12 sutures to close the wounds to his left wrist. *Id.* at 12-13. Mr. Johnson later admitted it was a suicide attempt. *Id.* at 8, 304, 353, 360.

On June 5, 1995, when he was 17, he was taken to the emergency room of St. John's Mercy Medical Center. *Id.* at 8-9, 360-365. Mr. Johnson was supposed to have been seen at the Meacham Clinic for treatment for his past hospitalizations, but this did not occur. *Id.* During the evaluation, the doctor spoke with Mr. Johnson's mother about alternatives including sending Mr. Johnson to Hawthorne State Facility due to his suicidal and other threats and the lack of efficacy of repeated hospitalizations at St. John's. *Id.* In the end, they elected to have Mr. Johnson hospitalized on the Adolescent Unit at St. John's. *Id.*

13

His mother reported he was recently more reclusive, lost 10 to 15 pounds, and had had difficulty sleeping. *Id.* at 348, 360. The physical examination revealed cigarette burns on his forearms and wrist lacerations in the process of healing. *Id.* at 301, 348. Mr. Johnson reported that he thought about suicide daily. *Id.* at 363, 386. While there, he resumed treatment with Prozac because it had a positive result in the past. *Id.* at 302, 349, 383. The doctor also prescribed 50 mg of Vistaril for sleep. *Id.* at 349, 383.

Mr. Johnson was discharged on June 9, 1995. *Id.* at 7-9, 301-03. Mr. Johnson was prescribed 20 mg of Prozac when discharged. *Id.* at 302. The discharge diagnoses were Major Depression, Recurrent, Moderate; Borderline Personality Disorder; and Thyroid Abnormalities. *Id.* at 301. He was discharged to his grandmother's care. *Id.* at 302.

On June 19, 1996, Mr. Johnson, now 18 years old, voluntarily admitted himself to the Southeast Missouri Mental Health Center. *Id.* at 153, 156. He appeared after being referred to the facility by the Washington County Hospital Emergency Room for further evaluation of his suicidal tendencies. *Id.* at 156. He was accompanied by his grandmother, who he was living with at the time. *Id.* Mr. Johnson reported that he had a "blackout," was hearing voices, and seeing his dead friends telling him to kill himself. *Id.* The day before he was admitted, he ran to the back of the house with a knife, and before his grandmother could get to him, he cut his wrist. *Id.* at 156, 161. "Low intellect and self-esteem" were noted in the initial screening. *Id.* at 153, 161. He had been staying with his grandmother for a couple of weeks. *Id.* at 161. When he cut himself with the knife, he said he wanted to join his dead friends, both of whom had committed suicide. *Id.*

14

His diagnoses were Major Depression, recurrent; Psychotic Disorder, NOS; and Polysubstance Dependence. *Id.* at 152. During his admission, he was also evaluated to determine his intellectual functioning, results "suggesting he possesses a significant cognitive weakness in his verbal abilities as a whole." *Id.* at 159. Mr. Johnson's score "suggests a significant impairment in his auditory/short term memory and concentration ability." *Id.* at 160. During this admission, Mr. Johnson was prescribed Paxil, 20 mg per day. *Id.* at 150. He was discharged to the Southeast Community Treatment Center in Farmington with aftercare at Park Hills Mental Health Service in Park Hills. *Id.* at 151. Records from Comtrea reflect Mr. Johnson was at the Aquinas Center in Southwestern Missouri from July 8, 1996, to August 8, 1996, but relapsed shortly after he left. *Id.* at 282.

On October 13, 1996, Mr. Johnson walked into the St. John's Mercy Medical Center ER. Ex. 7 at 347. He was 18. Mr. Johnson spoke of "slashing his jugular vein." *Id.* The ER sent him to the Metropolitan St. Louis Psychiatric Center. *Id.*

On the same date, Mr. Johnson was admitted to the Malcolm Bliss Mental Health Center at the Metropolitan St. Louis Psychiatric Center. *Id.* at 70-73, 95, 98, 130. The chief complaint was listed as, "I want to cut my jugular so I can die." *Id.* at 70. The diagnoses when admitted were Depression, NOS; Ethanol and Marijuana Dependence; History of Crack Cocaine, LSD and Amphetamine Abuse; and Conduct Disorder and Borderline Personality Traits. *Id.* at 73. He did well until October 27, 1996, when "he had an episode where he was crying and very upset, again requiring sedative medication, but

15

nothing in terms of physical restraint was required." *Id.* On October 29, 1996, he was discharged to Athena House and was being treated with Haldol 5 mg. *Id.* at 69.

Comtrea Community Treatment records reflect Mr. Johnson was admitted on October 29, 1996, and discharged on November 7, 1996. *Id.* at 281-83. The intake psychiatric evaluation occurred on October 30, 1996. *Id.* at 284. As a result of the psychiatric evaluation, Haldol was discontinued, he was prescribed Mellaril, 25 mg, and Vistaril, 50 mg, and it was recommended Mr. Johnson continue treatment at Athena. *Id.* at 286. The discharge summary reflects Mr. Johnson's emotional turmoil and concomitant suicidal ideation hindered his treatment. *Id.* at 281. He was in the residential treatment program for nine days before and was then referred back to the Metropolitan Psychiatric Center due to his "continued active suicidal ideation." *Id.* The summary reflects he left at 10:45 a.m. on November 7, 1996, with a psychiatric discharge. *Id.*

On November 8, 1996, Mr. Johnson was admitted a second time to the Metropolitan St. Louis Psychiatric Center. *Id.* at 17. He was admitted from the emergency room after threats to harm himself and others. *Id.* Though one of the Comtrea doctors discontinued his prescription for Haldol, Mr. Johnson was given both the Haldol and Mellaril, 25 mg together resulting in excessive sedation. *Id.* On November 12, 1996, he was evaluated and denied any thoughts of harming himself or others and said the flashbacks had decreased. *Id.* at 18. He said he felt uncomfortable dealing with his substance abuse issues in an inpatient program and agreed to participate in NA and AA on an outpatient basis. *Id.*

Mr. Johnson received a psychological referral and was seen on April 26, 1997, while at the St. Louis County Jail. Pet. R.91 Ex. 9 (Jail and prison records) at 83. The reason for the referral was that Mr. Johnson punched his right fist through a window and required sutures. "He stated that he always wanted to kill himself but promised not to make an attempt while he was here." *Id.* On November 29, 1997, Mr. Johnson was moved to suicide watch when an officer heard banging sounds and discovered the sound was from Mr. Johnson banging his head into the wall.[1] *Id.* at 57. An officer tried to talk with him, "but he was unresponsive and seemed confused." *Id.* A small puncture was on his wrists which residents told the staff was self-inflicted. *Id.* at 57-58. On December 10, 1997, St. Louis County Jail moved Mr. Johnson to another cell after "he continued to hear voices telling him to kill himself." *Id.* at 54. Mr. Johnson was provided a paper gown and referred to Dr. Krasnoff for further review. *Id.* The incident report reflects Mr. Johnson was "beating his head against a wall … [and] was also observed putting a pencil to his head threatening to puncture himself …" *Id.* at 55. The officer reported he was picking his skin at his wrist, climbing on the sink threatening to jump, climbing up around the light fixture threatening to find something blunt or sharp to hurt himself and said voices were telling him to kill himself. *Id.* at 56. On December 29, 1997, Mr. Johnson was again placed in a single cell when staff were informed by residents that Mr. Johnson was seeing things and feeling faint. *Id.* at 63.

---

[1] Mr. Johnson continues to bang his head into the wall. *See* Pet. Hab. Ex. 6 (Affidavit of Michael Tisius).

Mr. Johnson was moved to FRDC (Fulton Reception and Diagnostic Center) on March 17, 1998. Pet. R.91 Ex. 10 (Missouri Department of Corrections medical records) at 120-21, 123. When he complained of auditory and visual hallucinations, he was referred by an officer in Five House for an assessment. *Id.* at 123. Mr. Johnson's main complaint was depression and hearing intrusive voices. *Id.* at 120. He described the voices as being derogatory and saying things like, "Kill yourself or hurt others." *Id.* Dr. Ahsan Syed noted that Mr. Johnson had multiple previous psychiatric hospitalizations most always due to depression and hearing voices. *Id.* Mr. Johnson had been placed on Thorazine, which he thought worked better than Haldol, but he was still hearing voices. *Id.* Dr. Syed noted that the voices were "command in nature, and at times, telling him to hurt himself or that he is worthless." *Id.* Mr. Johnson appeared to be functioning in the borderline range of intellectual abilities. *Id.* Dr. Syed's diagnostic impression was Major Depression with psychotic features, Cannabis and Alcohol Abuse by history. *Id.* Dr. Syed prescribed 50 mg of Thorazine 3 times a day, 20 mg of Paxil every morning and requested a follow up in 30 days times. *Id.*

On April 24, 1998, Mr. Johnson was placed on suicide watch when he was seen crying frequently and reported that he was having auditory and visual hallucinations. *Id.* at 122. Mr. Johnson requested a change in medication to decrease the hallucinations. *Id.* Dr. Syed performed the follow-up evaluation, which was on an emergency basis because of Mr. Johnson's placement on suicide watch. *Id.* at 105. "[Mr. Johnson] was very distraught and said, 'They were coming to get him." *Id.* Dr. Syed's diagnostic impression remained unchanged, but he increased the Thorazine to 100 mg in the morning and

18

evening, continued the 20 mg of Paxil in the morning, and added .5 mg of Ativan twice daily. *Id.* at 105-06. Though Mr. Johnson reported still "seeing things" and had an elevated score on a thought-disturbance scale, evaluators discontinued all psychotropic medications. *Id.* at 18, 107.

Mr. Johnson was placed on probation again July 15, 1998. *Id.* at 13. On August 31, 1998, Mr. Johnson was admitted to Des Peres Hospital in St. Louis. Pet. R.91 Ex. 11 (2004-05-10 Des Peres Hospital records) at 9, 40, 95. Mr. Johnson reported a history of Schizophrenia and drug abuse. *Id.* at 10. He complained of hearing voices telling him to kill himself and worsening over the last few weeks. *Id.* He reported he had increased his drug abuse recently as well, using marijuana almost daily and binge drinking. *Id.* He reported using crack cocaine about one week before admission. *Id.* He was living on the St. Louis streets before his admission. *Id.* Police found him earlier in the evening, and they brought him to the emergency room on the condition he admit himself to the psychiatric ward. *Id.* Mr. Johnson was hearing voices telling him to jump off a bridge. *Id.* at 26, 59, 84. He reported a history of mutilation including cutting his wrists, sticking needles in his lips and body. *Id.* at 26, 59.

Mr. Johnson was prescribed Risperdal, Ativan, Restoril, and Tigan. *Id.* at 14-15, 17, 86-94. The September 2, 1998, Individual Master Treatment Plan listed a diagnosis of Major Depression with a Rule Out of Schizophrenia and deferred all other diagnoses. *Id.* at 61. "The patient states he had a happy childhood although he was molested by a neighbor at age 6 but just once." *Id.* at 18. Later in the records there is a note he reported being molested by a neighbor at age 13. *Id.* at 18. Notes also reflected he became tearful

19

when talking about his mother's boyfriend trying to drown him when he was 6. *Id.* at 39.

He reported after several days of hospitalization and medication that the voices had

stopped. Mr. Johnson was admitted to Hillside Manor, a residential care facility in Bonne

Terre and arrangements were made for him to be discharged there. *Id.* at 37, 49.

Mr. Johnson was discharged on September 8, 1998. *Id.* at 40. The discharge

diagnoses were Schizoaffective Disorder and probable Mild Mental Retardation. *Id.* at 9,

40. According to a discharge summary by William Clendenin, M.D., Mr. Johnson was

"markedly psychotic" and admitted to the hospital for treatment for this reason. Mr.

Johnson's mental status was "consistent with paranoid psychosis." *Id.* at 40. Dr.

Clendenin reported that "[d]ue to his seeming retardation and severe psychotic

symptoms, it was felt that he belonged in a boarding home. We arranged for him to go

[to] the boarding home in Bon [sic] Terre and he was released." *Id.* His discharge

medication was 2 mg of Risperdal at bedtime. *Id.*

The St. Louis Circuit Court issued an arrest warrant for Mr. Johnson on September

9, 1998, and the return on the warrant was signed on September 10, 1998. Pet. R.91 Ex. 9

at 92-95.

In August of 2001, Mr. Johnson was in the St. Louis County Jail, and staff called

Dr. Karen Cotton-Williger to evaluate Mr. Johnson due to concerns he was suicidal. Trial

Tr. 1766. Dr. Cotton-Williger was the clinical psychologist at the St. Louis County Jail

and did evaluations in intake and on the floors to determine if people have mental health

issues that require special placement within the jail. *Id.* at 1764-65. She diagnosed him as

20

suffering from Schizophrenia, Post Traumatic Stress Disorder, and Borderline Personality Disorder. *Id.* at 1775.

On October 17, 2001, Mr. Johnson was admitted to the St. Louis Psychiatric Rehabilitation Center. Pet. R.91 Ex. 12 (2003-04-07 Missouri Department of Mental Health records) at 4, 11. He remained there until his probation was reinstated and he was discharged on January 9, 2002. *Id.* at 4. Mr. Johnson was transferred from the St. Louis Department of Justice for a presentence evaluation. *Id.* at 11. On the admission notes, the chief complaint was, "They sent me here because I hear voices." *Id.* On the discharge summary dated January 14, 2002, prepared by Dr. A. Mallya, the brief history and reason for admission included that Mr. Johnson was arrested two months before on probation violation charges, and upon admission to the St. Louis County Justice Center ("St. Louis County Jail"), the intensity of auditory hallucinations increased. *Id.* at 8. He became fearful, distressful, and anxious, and he could not sleep. *Id.* at 4. After first refusing all medications, he was put on Risperdal, up to 3  mg at bedtime, for seven days. *Id.* He developed nocturnal incontinence and was switched over to Zyprexa, on which he did not have nocturnal incontinence, and at the time of his admission, he was on 10 mg of Zyprexa per day. *Id.* Because of his history of mental illness, his probation officer requested a presentence psychiatric evaluation before the probation revocation hearing. *Id.* Under stress, the intensity of Mr. Johnson's hallucinations increased. *Id.* at 6. "He has periods of intense dysphoria, inability to sleep, and desires to hurt himself. During these periods, he has inflicted tattoos, cuts, and burns on his body." *Id.* His final discharge diagnoses were Schizoaffective Disorder in remission, Polysubstance dependence, and

Learning disorder, NOS. *Id.* at 8. Recommended treatment included 10 mg of Zyprexa, 20 mg of Paxil, and 100 mg of Trazodone at bedtime. *Id.*

On November 16, 2001, during his admission to the St. Louis Psychiatric Rehabilitation Center, Dr. John Rabun, a psychiatrist who was a Certified Forensic Examiner, interviewed Mr. Johnson. Pet. R.91 Ex. 13 (Report of Dr. John Rabun) at 3. Rabun reported his findings on December 7, 2001. Though Mr. Johnson was not experiencing symptoms at the time of the 2001 evaluation by Rabun, likely because he was taking Zyprexa, Mr. Johnson's previous symptoms included hearing both female and male voices who sometimes spoke in normal tones and other times addressed him in a derogatory way. *Id.* at 6. He said the voices sounded like they were coming from outside of his head, were intermittent rather than continuous, and could be temporarily interrupted by activities such as listening to music. *Id.* Mr. Johnson also reported having had delusions that people were trying to harm him or that people could read his mind. *Id.* at 6-7. Mr. Johnson said several times he was no longer experiencing these issues while on medication, and Dr. Rabun said he saw no evidence to contradict this assertion. *Id.* at 7. Dr. Rabun diagnosed Mr. Johnson as suffering from Schizophrenia, Undifferentiated Type, Episodic with no Inter-episode Residual Symptoms and Alcohol Dependence, Sustained Full Remission. Dr. Rabun concluded that "the examiner is of the opinion, with reasonable medical certainty, that Mr. Johnson is afflicted by a mental disease." *Id.*

Dr. Rabun recognized that Mr. Johnson had displayed paranoid delusions as a component of his illness. *Id.* at 8. Dr. Rabun concluded that if psychiatric deterioration

became evident, Mr. Johnson should be voluntarily or involuntarily hospitalized. *Id.* at 8-10.

When Mr. Johnson was released on probation, the St. Louis Psychiatric Rehabilitation Center referred him to ADAPT of Missouri. Pet. R.91 Ex. 8 at 198, 205. Mr. Johnson's admission date was January 23, 2002. *Id.* at 200, 205-08. Mr. Johnson's endorsed psychiatric symptoms were "hearing a mumbling man's voice whispering and telling me that I am worthless. I also get depressed and have trouble sleeping." *Id.* at 201, 213. The mental health assessment noted Dr. Mallya's most recent diagnosis that Mr. Johnson suffered from Schizophrenia, Paranoid Type. *Id.* at 201. At this point, his current medications were listed as 10 mg of Zyprexa, 100 mg of Trazadone, and 20 mg of Paxil. *Id.* at 202, 225. Also noted were Mr. Johnson's limited coping skills and a common predictor of crisis of non-compliance with his medications and traumatic events. *Id.* at 213. Mr. Johnson was assigned to Community Support Worker ("CSW") Dahley G. Dugbatey on February 12, 2002. *Id.* at 261. He was also assigned to Dr. Jitendra Patel and in Dr. Patel's April 10, 2002, notes, he diagnosed Mr. Johnson with suffering from Schizoaffective Disorder and Marijuana Abuse, Full Remission. *Id.* at 216. Mr. Johnson's current medications were listed as 10 mg of Zyprexa and 20 mg of Paxil. *Id.* at 217. Dr. Patel changed Mr. Johnson's prescription to 10 mg of Zyprexa and 10 mg of Trazadone on April 23, 2002. *Id.* at 224.

Mr. Johnson stayed in this program until he stopped seeing his clinical CSW the month before Casey Williamson was killed. He began missing psychiatrist appointments at the beginning of June 2002. *Id.* at 218. The last meeting Mr. Johnson attended with his

caseworker was on June 28, 2002. *Id.* at 233. His CSW spoke with him on July 10, 2002, when he informed her he could not go to his appointment with her. *Id.* at 232. A letter dated July 15, 2002, was sent to Mr. Johnson regarding the cancelled or missed appointment with his CSW and requesting he contact the program director. *Id.* at 268. Casey Williamson was tragically killed on the morning of July 26, 2002.

Following his arrest for Casey's murder, Mr. Johnson was admitted to the St. Louis County Jail on July 27, 2002, at 2:10 in the morning. Pet. R.91 Ex. 14 (2003-01-24 St. Louis County Justice Center Medical records) at 32. Two correctional officers from intake assisted him. *Id.* At the St. Louis County Jail, Mr. Johnson was immediately started on 10 mg of Zyprexa by mouth at bedtime and staff were ordered to give him a dose at 6:50 a.m. on July 27, 2002. *Id.* at 13. On July 28, 2002, a nurse at the jail reported Mr. Johnson "appears paranoid today" and appears to be in a "daze." *Id.* at 31. Dr. Cotton-Williger evaluated Mr. Johnson on July 29, and he told her that he wanted the death penalty. Trial Tr. 1773-74. Because of her prior evaluation and diagnoses, Dr. Cotton-Williger determined Mr. Johnson needed to stay in the infirmary. *Id.* at 1767-68, 1773-74. She was concerned that Mr. Johnson would have a difficult time coping with stressors, and she believed they would see some emotional instability and slippage in terms of him becoming suicidal and perhaps decompensating and becoming psychotic. *Id.* at 1775.

On July 30, 2002, a nurse saw Mr. Johnson is in his cell "crying and fearful." Pet. R.91 Ex. 14 at 31. Mr. Johnson denied feeling suicidal but stated that he sees "demons." *Id.* He told the nurse "he feels guilty and 'I am a bad person because of what I did.'" *Id.*

24

On August 1, 2002, staff observed Mr. Johnson squatting in the corner of his cell holding his head in his hands. *Id.* at 30. Staff asked Mr. Johnson to come over, and he informed the staff he was hearing voices. *Id.* Mr. Johnson walked to the mirror and told the voices to stop. *Id.* Mr. Johnson then began hitting his head on the mirror. *Id.* Staff called Dr. Cotton-Williger and informed her of Mr. Johnson's behavior. *Id.* Staff were ordered to place him on high suicidal watch, and he was moved to the rubber room. *Id.* On August 7, 2002, Mr. Johnson met with Dr. Cotton-Williger, who reported Mr. Johnson was hearing voices telling him "they're coming to get you" over and over. *Id.* at 21.

On September 9, 2002, Mr. Johnson reported to staff he was having increased nightmares of people chasing and hitting him. *Id.* at 29. On January 19, 2003, Mr. Johnson's medication was changed from Zyprexa to Zoloft 50 mg by mouth per day and Tofranil 75 mg by mouth at bedtime. *Id.* at 23.

On February 28, 2003, psychiatrist Dr. Ajans saw Mr. Johnson. Pet. R.91 Ex. 15 at 4-6. She reported Mr. Johnson had a bland affect. *Id.* at 5. He reported to her that his voices tell him to "kill, kill, kill." *Id.* Dr. Ajans prescribed Elavil 50 mg, for one week, and increased the dose after one week to 75 mg at bedtime. *Id.* Mr. Johnson also had been taking Loxitane, and she increased his Loxitane to 10 mg in the morning and 25 mg in the evening. *Id.* She continued his Cogentin .5 mg. *Id.*

On June 7, 2003, Mr. Johnson reported he swallowed an entire tube of toothpaste because he wanted to hurt himself. Pet. R.91 Ex. 16 (Missouri Department of Corrections Mental Health records) at 12. He was seen on June 9, 2003, and he reported he had been

25

raped about two weeks before. *Id.* at 12-13. During the suicide watch, Mr. Johnson reported he was hearing voices, staff noted his hygiene was bad, and Mr. Johnson was urinating on the floor. *Id.* at 14.

On June 16, 2003, Mr. Johnson informed mental health staff he was tired of hearing voices and that they were getting so loud they were screaming at him. *Id.* at 15. He also told the mental health worker that inmates in neighboring cells are making fun of him and telling him that the voices will kill him and he will be dead by morning. *Id.* On June 23, 2003, Mr. Johnson was on close supervision and seen again by staff. *Id.* at 18. They were informed Mr. Johnson scratched himself many places on his body. *Id.* Mr. Johnson explained he did this because the voices were loud. *Id.* He reported he placed so much paper in his ear that he could not get the paper out. *Id.*

On October 6, 2003, was seen individually and voiced several concerns. *Id.* at 22-24. They were that he was having increased anxiety, his chest hurt, it was hard to breathe, and he was seeing "little men on mice." *Id.* at 22. On November 7, 2003, Mr. Johnson hit his hand against the wall and had a "noticeable deformity of the knuckle" on his right hand. Ex. 14 at 29. He was moved to the infirmary. *Id.*

On November 19, 2003, Stephen Becker[2] and Byron English reported results of their examination Mr. Johnson at the Southeastern Missouri Correctional Center. Becker did the interview and testing while English provided supervision and oversight. Pet. R.91

---

[2] Although the State endorsed Becker as a witness, the State did not call him and instead only called English. Post-trial, both Becker and English were required to relinquish their licenses by the Missouri Division of Professional Registration, Committee of Psychologists.

Ex. 18 (Reports of Becker and English) at 2. Becker administered the Weschler Adult

Intelligence Scale, III ("WAIS-III") resulting in a Full-Scale IQ of 70. *Id.* at 8. Becker

also administered an achievement test revealing a third grade reading level and a first-

grade math level. *Id*. Mr. Johnson could read only on a very elementary level and perform

very basic math calculations. *Id.* Mr. Johnson reported prior episodes of seeing "little

people - three inches tall and they give me weird looks," and also having auditory

hallucinations in which voices told him to hurt himself. *Id.* at 8-9. He was medicated at

the time of the evaluation and reported no current psychotic symptoms. *Id.* Diagnoses

included Major Depressive Disorder, Recurrent, Severe, with Psychotic Features, in

partial remission; Polysubstance Dependence, in remission, within a controlled

environment; Antisocial Personality Disorder, and Borderline Intellectual Functioning.

*Id*. at 9.

On December 29, 2003, Mr. Johnson told DOC mental health staff he continued to

hear voices telling him derogatory remarks and that he was seeing "shadow people that

seem to come out of cracks." Pet. R.91 Ex. 16 at 25. He had been prescribed Thorazine,

and he was advised that the jail might increase the Thorazine to help. *Id.*

On January 14, 2004, Mr. Johnson reported to staff he could not see, he felt like he

had bugs crawling on him, and that he had been scratching himself. *Id.* at 25. On

February 27, 2004, Mr. Johnson was again seen by mental health staff. *Id.* at 30. One of

the staff called mental health to reported Mr. Johnson had been scratching his arm with

his fingernails. *Id.* The staff member reported Mr. Johnson told the staff member he

needed to get something out of him. *Id.* He was placed on suicide watch and moved. *Id.*

27

Mental health staff spoke with Mr. Johnson who reported that "bugs were crawling inside" and were "all over him." *Id.* He had to "get them out." *Id.* Medical trimmed his fingernails. *Id.* On April 2, 2004, staff were notified that Mr. Johnson had not been taking his medication. *Id.* at 35. When asked, Mr. Johnson told staff he was not taking his Thorazine because it was making him groggy. *Id.* at 34. Mr. Johnson's Thorazine was decreased the next day. *Id.* at 35-37.

On February 17, 2004, Delany Dean, PhD, reported the results of her evaluation. Pet. R.91 Ex. 19 (Report of Dr. Delany Dean) at 1-12. She evaluated Mr. Johnson on four days: March 10, 2003, September 30, 2003, December 2, 2003, and February 5, 2004. On all occasions, Mr. Johnson was taking antipsychotic medication. Dr. Dean noted that Mr. Johnson "expressed the belief that 'when I was born the world was created, and when I die the world will die.'" *Id.* at 9. She diagnosed Mr. Johnson as suffering from Schizophrenia (paranoid type, subchronic with acute exacerbation), Generalized Anxiety Disorder, Psychoactive Substance Abuse, Paranoid Personality Disorder, and Schizotypal Personality Disorder with Depressive and Avoidance Personality Traits. *Id.*

On June 7, 2004, Becker and English performed a second evaluation. Pet. R.91 Ex. 18 at 12. Their diagnoses changed from the first time (six months earlier) and now were Methamphetamine Intoxication, with Perceptual Disturbances; Polysubstance Abuse (Alcohol, Cannabis, Methamphetamine, Hallucinogens, Cocaine, and Inhalants) in Remission Within a Controlled Environment; Schizoaffective Disorder, Depressive Type; Malingering, Partial; History of Learning Disorder, NOS; and Antisocial Personality Disorder. *Id.* at 25.

28

On August 25, 2004, Mr. Johnson told mental health staff, "I am not from this dimension. – I was born in this world but my soul is from a different world." Pet. R.91 Ex. 16 at 44. On this same visit, Mr. Johnson also told staff, "I can't leave my army-of demons. A murder charge is pending. I'm pushing for the death penalty, so that I can cross over- to demon's world." *Id.* Mr. Johnson's lithium is increased this same day. *Id.*

Dr. Alias saw Mr. Johnson on November 3, 2004, during a psychiatric encounter, and Mr. Johnson reported he was still hearing voices and seeing things. *Id.* at 46. The doctor told him to get back on antipsychotic medications, but Mr. Johnson declined. *Id.* The next day, November 4, 2004, Mr. Johnson reported to mental health staff he wore his hooded sweatshirt because it muffled out noises that make his voices worse. *Id.* at 47. Mr. Johnson called one of the voices "Leviathan." *Id.* at 47; Ex. 15 at 44. He also reported he hears screams in his head, "like when someone shoots into a crowd" and has "demonic dreams with dead people and flames." Pet. R.91 Ex. 15 at 44.

On November 12, 2004, Mr. Johnson asked to be taken off Lithium because it caused him to feel restless. Pet. R.91 Ex. 16 at 48-49. On November 19, 2004, one of the correctional officers witnessed Mr. Johnson banging his head on his cell door and scratching himself to draw blood. Pet. R.91 Ex. 9 at 235. Mr. Johnson then wrote on the cell walls, "I'm the Dead." *Id.* Mr. Johnson was holding his head and crying, and he stated the voices were bothering him. Pet. R.91 Ex. 16 at 50. He was very agitated, self-scratching, and banging his head. Emergency medication was ordered to calm him down. *Id.* Mr. Johnson told staff the voices were blaming him for killing his grandfather. *Id.* On November 22, 2004, mental health staff spoke with Mr. Johnson who reported he was

doing better and attributed it to taking medication. *Id.* at 51. Mental health staff also noted that this was an improvement from the last interaction with him when he was observed scratching himself making visible welts on his body, pulling out the stitches in his toes, banging his head, slapping his penis, and yelling "bad boy, bad boy." *Id.*

Between 2002 and his trial in 2005, Mr. Johnson went back and forth from DOC to the jail six times. Trial Tr. 1777. Each time, he was in the psychiatric infirmary. *Id.* Even with medication, Mr. Johnson consistently reported symptoms of auditory hallucinations and difficulty sleeping. *Id.* at 1760-61, 1780.

Mr. Johnson was transferred to Potosi Correctional Center on January 19, 2005. Pet. R.91 Ex. 16 at 55. Mental health staff were informed that Mr. Johnson indicated he planned to harm himself earlier in the day. *Id.* On January 21, 2005, Mr. Johnson was seen by Dr. Ahmed Basheer for his initial psychiatric contact. *Id.* at 53. Mr. Johnson was delusional during this visit and told Dr. Basheer "I think I'm the 7th sign. I'm the end of the world when I die." *Id.* He also reported he has believed this since he was 19.

Judge Seigel sentenced Mr. Johnson to death on March 7, 2005. Pet. R.91 Ex. 9 at 187. Mr. Johnson continued to struggle with his severe mental health condition and the symptoms that tormented him after he was sentenced.

On March 17, 2005, mental health staff saw Mr. Johnson at his request. Pet. R.91 Ex. 16 at 63. Mr. Johnson reported to staff he was having difficulty sleeping because of nightmares of dead people coming to get him. *Id.* Mr. Johnson visibly trembled during the visit and reported to staff having command hallucinations to hurt himself. *Id.*

Kimberly Weitl, PsyD, evaluated Mr. Johnson as a new arrival at Potosi Correctional Center on March 20, 2005. Pet. R.91 Ex. 15 at 119. She administered the WAIS-III. *Id.* at 122. Mr. Johnson's Full-Scale IQ was 78. *Id.* Her diagnoses included Schizoaffective Disorder, per history; Alcohol Dependence, in a controlled environment; and Antisocial Personality Disorder. *Id.* at 124; Pet. R.91 Ex. 10 at 378. She also reported his level of intellectual functioning fell in the Borderline Intelligence range. Pet. R.91 Ex. 15 at 123.

On March 28, 2005, a correctional officer noticed Mr. Johnson sitting in the corner of his cell bleeding. Pet. R.91 Ex. 16 at 220. After removing Mr. Johnson from his cell, the correctional officer found a razorblade with the razor removed. *Id.* Johnny used the razorblade to cut his left forearm. *Id.* Johnny was distraught, and the prison moved to the chronic care clinic and put him in restraints. *Id.* at 64. Johnny voiced auditory command hallucinations and "florid suicidal thoughts." *Id.* Staff noted Johnny had poor insight and judgment. *Id.* Johnny told staff that if they did not restrain him, he would open his wounds and bite his tongue off. *Id.* at 65. The next day, staff observed Johnny in the corner of his cell crying and holding his hands over his ears. *Id.* at 68. Johnny wrote in feces on his window "die" and on his wall "were dead." *Id.* He tore the steri-strips off his lacerations and smeared feces all over it. *Id.* at 69. The prison medical staff started Johnny on 400 mgs of Seroquel on this date. *Id.* at 70.

On July 13, 2006, Mr. Johnson swallowed razor blades. *Id.* at 91. Medical reported Mr. Johnson "was talking like he was someone else who was trying to kill 'Johnny'." *Id.* The staff member continued, "I could not understand who he said he was, but he kept

talking about telling Johnny what to do and Johnny wouldn't do it." *Id.* Medical staff placed Mr. Johnson in the rubber room on suicide watch. *Id.* at 92. Dr. Ahmed ordered 8 mgs of Trilafon, Perphenazine, by mouth, and 3 mg of Cogentin as well crushed and floated because Mr. Johnson said he would not take it but would save it up. *Id.* at 91-92. By July 18, 2006, Mr. Johnson was prescribed 8 mgs of Perphenazine and 2 mgs of Cogentin. *Id.* at 95.

Dr. Pablo Stewart, a psychiatrist employed by the University of California at San Francisco, School of Medicine, as a clinical professor in psychiatry with his own private consulting practice, evaluated Mr. Johnson on April 27, 2007. PCR Tr. 8, 190. Dr. Stewart noted during his evaluation that Mr. Johnson's hygiene was not the best, had slow speech, and was responding to internal stimuli. PCR Tr. 191. During the evaluation, Mr. Johnson became distressed when talking about hearing voices and became psychotic right in front of Dr. Stewart. PCR Tr. 191. Dr. Stewart diagnosed Mr. Johnson with chronic psychotic disorder not otherwise specified, Post Traumatic Stress Disorder, and cognitive disorder not otherwise specified. PCR Tr. 196-98.

Dr. Craig Beaver, a licensed psychologist who specializes in clinical psychology, neuropsychology, and forensic psychology, evaluated Mr. Johnson two times, once on February 25, 2007, and once in April of 2007. PCR Tr. 584, 603. Dr. Beaver testified Mr. Johnson has a psychotic disorder that manifests itself in several different ways. Mr. Johnson has steady auditory hallucinations and identity preference. Both times Dr. Beaver met with Mr. Johnson, Mr. Johnson told him sometimes "it would be better if he was just executed because he believes that because he has special powers that that will

32

create some positive changes in the world." PCR Tr. 631. Dr. Beaver testified to a reasonable degree of neuropsychological certainty that Mr. Johnson has organic brain syndrome combined with significant psychiatric disorders that are permanent conditions for him. PCR Tr. 641. These conditions affect Mr. Johnson's ability to think, act rationally, to deal with stress, and to make appropriate decisions. PCR Tr. 641.

On June 20, 2007, and June 21, 2007, Robert Gordon PhD, Director, Forensic Evaluation Division, St. Louis Behavioral Medicine Institution, and Brooke Kraushaar, PsyD, evaluated Mr. Johnson. Pet. R.91 Ex. 20 (Report of Drs. Gordon and Kraushaar) at 2. They reported he was cooperative and appeared to focus "reasonably well." *Id.* at 3. His mood was described as "largely subdued and neutral," however during the clinical examination process "he became frightened and intimidated" and broke down crying. *Id.* He felt that the examiner had stared at him strangely and was "angry" with him. *Id.* He responded to reassurance but was "wary" for the rest of the interview process; the examiners felt that this reaction was genuine. *Id.* Gordon and Kraushaar concluded that Mr. Johnson "can be diagnosed with a psychotic illness, a co-occurring depressive disorder, and Low Average intellectual functioning with significant memory deficits." *Id.* at 5.

On November 21, 2007, Mr. Johnson reported to psychiatrist Angeline Stanislaus that he was hearing voices again telling him that his family was dead. Pet. R.91 Ex. 17 (2022-10-31 Medical History records) at 1-2. Mr. Johnson was also having nightmares about the crime again. *Id.* Mr. Johnson agreed to medication changes on this date. Mr. Johnson was prescribed Perphenazine 8 mg bid, and 2 mg hs, Clonidine .3 mg at bedtime,

Mirtazapine 15 mg hs, and Desipramine 50 mg. *Id.* Mr. Johnson was on "Watch Take" likely because of his report earlier that he would save his medications as well as the fact that he swallowed razors in an attempt to harm himself. *Id.* at 2.

On December 28, 2007, Mr. Johnson reported to Dr. Stanislaus the voices were getting worse and are nagging and tormenting him. *Id.* At 3-4. He was unable to sleep more than a couple of hours. *Id.* at 3. Mr. Johnson had cut his wrist a week prior. *Id.* Dr. Stanislaus recommended Geodon be added to his medications. *Id.* On January 21, 2008, Mr. Johnson reported to Dr. Stanislaus that his hallucinations had increased, he felt more agitated, had more nightmares, and he had paranoia. *Id.* at 5. She increased his Geodon and kept Mr. Johnson on Perphenazine, Clonidine, and Remeron. *Id.* at 6.

On June 10, 2008, Mr. Johnson reported to Dr. Stanislaus he began hearing voices since being in administrative segregation and they were getting progressively worse. *Id.* at 16. The voices occurred every day and included a demonic voice, several other voices that degraded him, laughed at him, and told him that he was worthless. *Id.* When the doctor asked about his unkempt hair, Mr. Johnson replied he did not want to cut his hair while in administrative segregation because he was afraid he would catch some kind of infestation. *Id.* He reported a sense of paranoia, stating, "it feels like my family is playing games on me." *Id.*

A full year later, Mr. Johnson was doing better. Pet. R.91 Ex. 17 at 39. On June 25, 2009, his psychiatrist decided to decrease Mr. Johnson's Trilafon and increase his Geodon to help decrease the risk of Mr. Johnson developing Tardive Dyskinesia. *Id.* at 40. On January 14, 2010, Mr. Johnson reported to mental health staff that he was hearing

funny noises and mumbling. *Id.* at 51. The voices called him all kinds of names, made fun of his case, and were worse when during stress. *Id.* He had been compliant with his medications. *Id.*

On August 12, 2010, Mr. Johnson was seen by the mental health nurse. *Id.* at 66. Staff and other offenders reported to the nurse that Mr. Johnson was increasingly paranoid and not acting like he normally does. *Id.* Mr. Johnson admitted that was true and that he was not always taking his medication. *Id.* Mr. Johnson told the nurse that the medications made him too tired. *Id.* Two weeks later, on August 24, 2010, Mr. Johnson was seen by mental health again, and he reported his anxiety was really bad and he had been having panic attacks. *Id.* He told staff he had been hearing voices all the time, and the voices degraded him and told him that he was worthless. *Id.* He reported seeing shadows once in a while. *Id.*

Two days later, August 26, 2010, the psychiatrist met with Mr. Johnson. *Id.* at 67. Mr. Johnson reported he became non-compliant intermittently for about three months, and two weeks ago, he started hearing voices again. *Id.* The psychiatrist prescribed ta higher dose of perphenazine and instructed him to take his clonidine at night. *Id.*

On September 21, 2010, staff met with Mr. Johnson for his chronic care encounter. *Id.* at 70. Mr. Johnson told staff he continued to have weird dreams every three days, tried to wake up and was unable to, and that he experienced enuresis. *Id.* He reported he wakes up at night while he is urinating on his TV or somewhere else inappropriate. *Id.* He also reported he continues to hear voices that are demanding and demeaning, and he has difficulty maintaining his train of thought. *Id.*

35

On October 26, 2010, the custody staff requested that the mental health nurse see Mr. Johnson. *Id.* at 73. Custody staff reported to the nurse that Mr. Johnson had been pacing and told one of the officers there were cameras in the cell and he would not get in trouble. *Id.* When asked by the nurse what was going on, Mr. Johnson replied in a paranoid fashion that he was stressed over family problems and that the officers walk past his cell looking in at him just to irritate him. *Id.* He also told the nurse that the correctional officers call the white shirts over and they all walk by. *Id.*

Two days later, on October 28, 2010, the psychiatrist saw Mr. Johnson. *Id.* at 74. The staff reported to the psychiatrist a deterioration in Mr. Johnson's mental state over the past two weeks. *Id.* Staff reported Mr. Johnson became more withdrawn and paced more. *Id.* Mr. Johnson told staff he knew about the cameras installed in his room. *Id.* Staff also reported Mr. Johnson stared into the wall for long periods of time and observed him to be in his own thoughts. *Id.* The psychiatrist noted Mr. Johnson lost weight yet had been medication compliant. *Id.* The psychiatrist noted Mr. Johnson's flat affect, that he was detached, and that he periodically scanned his environment and stopped talking. *Id.* The psychiatrist started Mr. Johnson on 5 mgs of Zyprexa and decreased his Geodon. *Id.*

On November 4, 2010, custody staff again requested a mental health nurse see Mr. Johnson. *Id.* at 75. Mr. Johnson told staff the cameras were taken out of his cell, and he reported he was going to be set up. *Id.* Mr. Johnson packed all his belongings and brought them down to the sallyport. *Id.* The nurse assured Mr. Johnson he is safe and not in trouble. *Id.* The nurse noted Mr. Johnson had "apparently not received the new medication that was order for him last week which was not in stock." *Id.*

36

On January 18, 2012, the psychiatrist met with Mr. Johnson. *Id.* at 125. He reported to her for the past week, he was hearing voices again, making him feel anxious and distracted. *Id.* Mr. Johnson agreed to try a higher dose of Zyprexa. *Id.* On January 31, 2013, the psychiatrist again met with Mr. Johnson. *Id.* at 155. Mr. Johnson was doing well since he started Olanzapine. *Id.* Mr. Johnson agreed to stop his Perphenazine and Cogentin, to continue his Olanzapine, and to have his Clonidine increased to .3 mg. *Id.* at 156.

On August 6, 2013, the psychiatrist met with Mr. Johnson. *Id.* at 174. Mr. Johnson was anxious "he is running out of his appeals and is worried soon he will be a death row inmate." *Id.* Mr. Johnson reported he still heard voices making fun of him, but the medicine has helped. *Id.* On September 24, 2013, Mr. Johnson asked to stop taking Elavil, and the doctor discontinued it per his request. *Id.* at 180. On November 23, 2015, Mr. Johnson saw the psychiatrist and reported he was doing well; however, he still heard voices, but they are mumbles, and the kitchen noise and bickering are "annoying." *Id.* at 242. The psychiatrist notes reflect Mr. Johnson has "chronic severe mental illness: schizophrenia, complicated by symptoms of possible hypothyroidism." *Id.* at 243.

On May 16, 2016, Mr. Johnson spoke with a mental health worker for his Chronic Care Encounter. *Id.* at 252. Mr. Johnson spoke of his Wiccan beliefs and shared he does not cast spells to hurt people because it is against Wiccan beliefs. *Id.* On September 28, 2016, the psychiatrist met with Mr. Johnson. *Id.* at 454. Mr. Johnson reported during the past month voices laughing and telling him people are out to get him, mumbles which forced him to check himself into administrative segregation. *Id.* He reported feeling too

37

paranoid and believed administrative segregation was safer. *Id.* 10 mgs of Loxapine were prescribed as the Zyprexa is "not efficacious alone for treatment." *Id.* at 455.

On February 13, 2020, the psychiatrist met with Mr. Johnson, and Mr. Johnson shared his history of psychiatric treatment. *Id.* at 340. He reported voices saying things like "you are worthless" and reported paranoia of people plotting on him. *Id.* He told the psychiatrist, "sometimes I think that the world will end if I die." *Id.* On May 7, 2020, Mr. Johnson told the psychiatrist he was not doing well. *Id.* at 347. "He report[ed] a racing mind, inability to focus, hearing male/female voices inside of his head telling him that people talk about him, end of world, 'he is God etc.'" *Id.* The psychiatrist increased Mr. Johnson's Olanzapine prescription to 10 mgs. *Id.* at 348.

On July 28, 2020, the prison medical staff took Mr. Johnson off Olanzapine and increased his Clonidine. *Id.* at 354. On January 22, 2021, mental health staff met with Mr. Johnson. *Id.* at 375. He reported that he was hearing voices more frequently could not sleep. *Id.* He requested a meeting with the psychiatrist. *Id.* The psychiatrist met with Mr. Johnson on January 28, 2021. *Id.* at 376. Mr. Johnson "report[ed] chatter of multiple voices that 'I cannot understand.'" *Id.* He also reported mood swings and poor sleep. *Id.* Mr. Johnson had developed allergic blisters in his mouth due to Trileptal which had been started on November 5, 2020. *Id.* It was discontinued on November 21, 2020. *Id.* at 377. The psychiatrist started Mr. Johnson on Aripiprazole for psychosis and mood and cross-tapered it with Thiothixene. *Id.*

On his May 20, 2021, psychiatric appointment, Mr. Johnson reported "he has mood swings & still hears voices 'chatter, laughter, yellling [sic]' of multiple voices

38

inside [his] head." *Id.* at 389. Mr. Johnson's Abilify was increased to 20 mg for mood/psychosis and two other drugs were decreased: Thiothixene to 5 mg and Benztropine to .1 mg. *Id.* at 391.

By September 15, 2021, Mr. Johnson's condition worsened dramatically. Mental health saw Mr. Johnson in administrative segregation. *Id.* at 400. Mr. Johnson had punched his television "due to believing staff are watching him." *Id.* Mr. Johnson reported increased paranoia, which was causing him problems with his cell mate "as he has been tearing up his cell." *Id.* Mr. Johnson told staff he had "increased stress due to the execution pending of another offender." *Id.* Mr. Johnson reported auditory hallucinations telling him others were out to get him. *Id.* Mr. Johnson's medications had been recently changed and Mr. Johnson said due to this he felt "as if something is squeezing his brain." *Id.* The next day, Thiothixene was discontinued, and Aripiprazole was increased to 30 mgs. *Id.* at 402.

On September 24, 2021, Mr. Johnson made suicidal statements to staff telling them he was a vampire. *Id.* at 404. Mr. Johnson told staff "I am not suicidal. I am a vampire. I have been one for awhile [sic]. I am hearing everubodu [sic] in the camp. I found [out] about the machine. It is everybody." *Id.* at 405. Mr. Johnson explained to a nurse that "he was on suicide watch due to realizing that he was a vampire, which he substantiated by noting he can 'flex my eyes' and 'manipulate his bones/back as well.'" *Id.* at 406. "He noted his ears are very sensitive and he can 'hear the whole camp at one time' which he confirmed was overwhelming." *Id.* In the past year, Mr. Johnson had 13 nursing visits, four psychiatry visits, and 12 chronic care follow up visits, but no visitors

since 2016. *Id.* The nurse observed Mr. Johnson rocking throughout most of the evaluation, and while Mr. Johnson's speech was normal for tone and volume, "content was dominated by delusional themes of being a vampire, having sensitive hearing." *Id.* His mood was depressed, and affect was flat. *Id.* "He appeared to be distracted by internal stimuli, which was evidenced by delays in responding and asking me to repeat questions at times." *Id.* "He endorsed having auditory hallucinations and reminded me frequently of being a vampire." *Id.*

A week later, on September 24, 2021, Mr. Johnson was seen by mental health staff at which time he reported, "I am still having AH [auditory hallucinations] all the time. It is like a constant humming in my head. It is constantly in my head. It is more than one voice. They call my name out and doors slamming all the door[sic]." *Id.* at 409. The psychiatrist increased Mr. Johnson's dose of Clonidine to .1 mg at noon and .3 mg at bedtime when she met with him December 7, 2021. *Id.* at 418.

By February 3, 2022, Mr. Johnson reported he was doing well and wanted a cellmate again. *Id.* at 423. On March 4, 2022, the prison medical staff started Mr. Johnson on Lithium, 150 mgs at noon and bedtime. *Id.* at 427. On July 5, 2022, Mr. Johnson was in administrative segregation and reported that he was there "for a fight." *Id.* at 436. Two days later, Mr. Johnson was seen for a non-penetration PREA 10-minute evaluation. *Id.* at 437. Mr. Johnson reported that on the evening of June 15, 2022, while he was in the protective custody unit, his cellmate, Offender ███, made various sexual statements towards him saying "I was his boo and I belonged to him and stuff." *Id.* Mr.

Johnson reported that ███ began to masturbate on the top bunk while Mr. Johnson was in the cell with him. *Id.*

On Mr. Johnson's October 20, 2022, visit with his psychiatrist, Lithium was replaced by 100 mgs of Lamictal. On October 26, 2022, staff in housing unit four contacted mental health stating, "[Mr. Johnson] was talking to himself, yelling at his tablet and waking up yelling at night." *Id.* at 451. Mr. Johnson's cellmate reported to staff he had not slept for three days due to concern that Mr. Johnson may "spas [sic] out." *Id.* Staff reported Mr. Johnson's behavior deteriorated over the past three days. *Id.* Mr. Johnson reported experiencing an increase of auditory hallucinations and "stated it is like a conversation occurring." *Id.* Staff asked him "about yelling about aliens and robots, [Mr. Johnson] stated that he was singing." *Id.* "It is believed that [Mr. Johnson] may be minimizing his symptoms and things bothering him. *Id.* at 452. Mr. Johnson was placed on close observation. *Id.* On October 27, 2022, mental health staff met with Mr. Johnson at his cell door. Resp. R.91 Ex. C (DOC Psych. Records) at 578. Mr. Johnson reported things were "going well" but also reported auditory hallucinations. *Id.* He admitted talking to himself but denied waking up screaming the night before. *Id.*

Mr. Johnson was seen by the psychiatrist on October 28, 2022 as a result of this incident. *Id.* at 576. He reported "jumping up out of his sleep, []talking to aliens[] in the middle of the night, though he does not remember doing so." *Id.* Mr. Johnson told the doctor his auditory hallucinations "are like a voice just inside his ear (not inside head or other location around the room)" and "are always at least a mumble in the background," which gets worse under stress. *Id.* He cited the status of his legal case as a source of

41

increased stress. *Id.* Mr. Johnson also told the psychiatrist that he feared his current medication, Abilify, was not working and could not recall any medication working except Klonopin, which he had been given when he was in jail in St. Louis but was not an option at Potosi. *Id.* He felt his brain "squirms and hurts," which he believed was due to the medication. *Id.* at 577. During the appointment, the psychiatrist noted Mr. Johnson appeared "disheveled" and had "extensive superficial scratches/plaques to face." *Id.* Later that same morning, mental health staff met with Mr. Johnson again at his cell door and he reported that his auditory hallucinations were "so so" that day. *Id.* at 579. He was removed from close observation because he was no longer exhibiting signs that caused "acute concern" for his or others' safety. *Id.*

During an encounter with mental health staff on November 2, 2022, Mr. Johnson was not exhibiting signs of psychosis, but on November 7, 2022, he was having problems with his cellmate because Mr. Johnson was talking to himself and having issues with enuresis. *Id.* at 580-81. During an appointment with the psychiatrist the next day, he denied that his auditory hallucinations were worsening and denied "talking to aliens," but the doctor's notes indicate he was still experiencing voices that were "mumbling." *Id.* at 581-82. His next appointment was on November 30, 2022, at which time he denied having auditory hallucinations, but the notes indicate he was "disheveled," had "extensive superficial scratches/plaques to face," and that his auditory hallucinations were "mumbling." *Id.* at 583. He again denied auditory hallucinations on December 28, 2022. *Id.* at 585, 587.

On January 23, 2023, Mr. Johnson was seen for ten minutes and reported "he's doing better and is hearing less voices." *Id.* at 588. On February 2, 2023, he reported that he did not have auditory hallucinations while on medication, and the notes state, "Offender has a history of auditory hallucinations. He reports none since taking medication." *Id.* at 590. However, on March 8, 2023, Mr. Johnson reported that "the voices are still 'a whisper' and at baseline." *Id.* at 594. **Despite the report that he was hearing voices, albeit quiet ones,** the notes again state, "Offender has a history of auditory hallucinations. He reports none since taking medication." *Id.* He denied auditory hallucinations on April 6, 2023. *Id.* at 595.

On April 20, 2023, Mr. Johnson was notified that the death warrant had been issued in his case. *Id.* at 596. Mental health staff reported he was "tearful but calm" and "denied current mental health concerns." *Id.* He similarly reported he was doing well and had no mental health concerns on April 26, 2023, and May 4, 2023. *Id.* at 597, 599. On May 10, 2023, however, he was "now having minor auditory hallucinations. He described them as laughing or chattering in his ear," which he reported hearing "a few times each day" and said started "a few weeks ago." *Id.* at 601-02.

As shown above, due to his symptomology and need for treatment, Mr. Johnson has been evaluated many times during his hospitalizations, in carceral settings, and by court order or at the request of his legal teams. The results of all these evaluations included various diagnoses; however, all reflect the consistent presence of a psychotic disorder and severe mental illness.

43

## GROUND FOR RELIEF

I.     **Mr. Johnson is not competent to be executed and his execution would violate the Eighth Amendment of the U.S. Constitution.**

       A.     **Because Mr. Johnson lacks a rational understanding of the reason for his execution and is incompetent to be executed, his execution violates the Eighth Amendment.**

The Eighth Amendment's prohibition on cruel and unusual punishment bars the government from executing someone who is incompetent. *Panetti*, 551 U.S. at 959-60; *Ford*, 477 U.S. at 409-10; *see also Madison v. Alabama*, 139 S. Ct. 718, 722 (2019). A condemned prisoner is incompetent when he cannot rationally understand his punishment or the reason for it. *Madison*, 139 S. Ct. at 722; *Panetti*, 551 U.S. at 959-60; *Ford*, 477 U.S. at 417.

As in *Panetti*, a prisoner's mental illness involving delusional beliefs may make him unable to "reach a rational understanding of the reason for [his] execution." *Panetti*, 551 U.S. at 958. In addition, other mental impairments, such as dementia, may similarly make a person unable to understand the reasons for his execution. *Madison*, 139 S. Ct. at 726-27. The critical inquiry is whether a person has the "rational understanding" *Panetti* and *Ford* require. *Id.* at 727. If a person's "mental shortfalls . . . deprive a person of the capacity to comprehend why the State is exacting death as punishment, then the *Panetti* standard will be satisfied." *Id.* at 727-28.

Mr. Johnson's understanding of the reason for his execution is "that Satan is using the State of Missouri to execute him to bring about the end of the world[.]" Pet. R.91

Ex. 1 at 54. Mr. Johnson has confirmed this to be the reason because the voice of Satan has told him so. *Id.*

Mr. Johnson has suffered from severe mental illness and cognitive impairments all his life. See Facts, *supra*, at 5-43; Pet. R.91 Ex. 1 at 9-49, 53. His recent neuropsychiatric evaluation exhibited a "combination of conditions" including "an extensive delusional belief system involving paranoid, grandiose, and bizarre beliefs." Pet. R.91 Ex. 1 at 54. Mr. Johnson suffers from "disorganized thought processes and thought blocking. His beliefs about why he is to be executed are rooted in delusional thinking, the product of a severe psychotic mental illness and a cognitively impaired brain." *Id.* at 53. Furthermore, "[h]is brain damage/dysfunction does not allow him to rationally weigh and deliberate or reason through his decisions and thinking." *Id.* at 54. As a result of this combination of conditions, Mr. Johnson's "understanding of the reason for his execution—that Satan is using the State of Missouri to execute him to bring about the end of the world—is irrational." *Id.*

His recent neuropsychiatric evaluation explains that "this irrational understanding is further demonstrated by his belief that he potentially can change this plan by going into the judge and lawyers' heads or that the spirits of the underworld can influence the State to not execute him for Satan's purposes." *Id.* Mr. Johnson also has "delusional beliefs regarding his ability to live on after death in an animal's mind or as the undead[, which] are particularly troubling and indicate a lack of rational awareness of the finality of his punishment." *Id.*

The evaluation concludes that by virtue of his severe psychotic mental illness and a cognitively impaired brain, Mr. Johnson "does not have a rational understanding of the reasons for his execution" and "is incompetent to be executed." *Id.* Thus, because Mr. Johnson does not have a rational understanding of the basis for this execution, his execution subjects him to cruel and unusual punishment in violation of the Eighth Amendment. *Madison*, 139 S. Ct. at 722; *Panetti,* 551 U.S. at 959-60; *Ford,* 477 U.S. at 409-10, 417.

### B.   Mr. Johnson made a "substantial threshold" showing of incompetency and is therefore entitled to fair process in accordance with *Ford* and *Panetti*.

When a petitioner has made a substantial threshold showing of incompetency, he is entitled to a stay of execution for a judicial hearing regarding his competency:

> Once a prisoner seeking a stay of execution has made "a substantial threshold showing of insanity," the protection afforded by procedural due process includes a "fair hearing" in accord with fundamental fairness. *Ford*, 477 U.S. at 426, 424, 106 S.Ct. 2595 (opinion concurring in part and concurring in judgment) (internal quotation marks omitted). This protection means a prisoner must be accorded an "opportunity to be heard," *id.* at 424, 106 S.Ct. 2595 (internal quotation marks omitted), though "a constitutionally acceptable procedure may be far less formal than a trial," *id.* at 427, 106 S.Ct. 2595.

*Panetti*, 551 U.S. at 949.

In *Panetti*, the facts establishing the "substantial showing" necessitating a competency hearing included merely "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row on February 3, 2004." 551 U.S. at 935, 938. "The new evidence, according to counsel,

demonstrated that petitioner did not understand the reasons he was about to be executed." *Id.* at 938. In *Madison,* the petitioner similarly presented two affidavits from the legal team and references to prior medical records. Petition for Suspension of Mr. Madison's Death Sentence Pursuant to Alabama Code § 15-16-23 Because He Is Incompetent to be Executed, *Madison v. State of Alabama,* No. CC-85-1385.80 (Ala. Cir. Ct. Feb. 12, 2016). The Court ruled that the evidence was sufficient to establish a prima facie case of incompetency. *Madison,* 139 S. Ct. at 718.

In his state habeas petition, Mr. Johnson presented similar facts: references to prior medical records and a report of a neuropsychiatrist concluding that Mr. Johnson—due his irrational delusions—does not have a rational understanding of the basis for his execution. Ex. 1 at 54. Rather, he believes the reason for his execution is that Satan is using the State of Missouri to end the world. Pet. R.91 Ex. 1 at 54. References to similar types of delusions about being "the end of the world," being "the Dead," being a vampire, demons, and spiritual warfare are peppered throughout Mr. Johnson's medical records. *See, e.g.* Pet. R.91 Ex. 9 at 235; Pet. R.91 Ex. 14 at 31; Pet. R.91 Ex. 16 at 44, 55, 68; Pet. R.91 Ex. 17 at 340, 348, 404-06; Pet. R.91 Ex. 19 at 9; Resp. R.91 Ex. C at 39, 48, 463, 470, 527, 567-68. These records support Dr. Agharkar's conclusions and evince the longstanding nature of Mr. Johnson's delusional framework. Curiously, the Missouri Supreme Court unreasonably ignored those many references.

As in *Panetti* and *Madison*, the evidence Mr. Johnson presented to the Missouri Supreme Court was factually sufficient, under the standard set forth in *Panetti*, to establish a substantial threshold of incompetency. 551 U.S. at 938, 949; *Madison,* 139 S.

47

Ct. at 718. Although no statute or court ruling explicitly defines the quantum of evidence necessary to establish a threshold showing, it cannot be equal to that required to meet the ultimate determination of incompetency. *Panetti*, 551 U.S. at 950 ("substantial threshold showing of insanity" triggers requirement of further protections and **process allowing chance to prove ultimate burden**). In any event, Mr. Johnson produced materially indistinguishable factual evidence from that in *Panetti* and *Madison* establishing the threshold showing.

As noted in the lengthy psychiatric treatment history above, there is "extensive evidence of mental dysfunction considered in earlier legal proceedings," (*Panetti*, 551 U.S. at 950), that simply cannot be ignored. Thus, at minimum, Mr. Johnson was entitled to a hearing on the issue of whether he possesses a rational understanding of the reasons for his execution.

Furthermore, by requiring Mr. Johnson in the "threshold showing" stage to prove the ultimate question of his competency and making factual findings and credibility determinations without providing a hearing, the Missouri Supreme Court violated basic tenets of Missouri legal requirements. As noted in *Panetti*, at 950-51 (citing *Ford*, 477 U.S. at 424), the state court's failure to comply with the requirements of state law invites "arbitrariness and error." Thus, that the Missouri Supreme Court held Mr. Johnson to an unreasonable standard that was both contrary to and an unreasonable application of that set forth in *Panetti*. *See id.*

The Missouri Supreme Court's process of determining that Mr. Johnson had not established the threshold showing, in which it simultaneously engaged in its own fact-

finding process, involving credibility determinations, without providing basic process or an opportunity for a full factual inquiry or rebuttal, was fundamentally unfair. As in *Panetti,* "[t]he fact finding procedures upon which the court relied were 'not adequate for reaching reasonably correct results' or, at a minimum, resulted in a process that appeared to be 'seriously inadequate for the ascertainment of the truth.'" 551 U.S. at 954 (quoting *Ford*, 477 U.S. at 423-24). Given that Mr. Johnson has established the required threshold showing of incompetence and the Missouri Supreme Court's decision was both contrary to and an unreasonable application of that set forth in *Panetti*, this Court should apply *de novo* review and provide Mr. Johnson a fair hearing on his incompetence claim.

**C.   28 U.S.C. § 2254(d) does not bar review of Mr. Johnson's claim because the Missouri Supreme Court's denial of Mr. Johnson's incompetency claim without fair process was contrary to or an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence.**

Under 28 U.S.C. § 2254, this Court may grant habeas relief if the State court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, or if it was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). Here, Mr. Johnson presented materially indistinguishable factual evidence from that in *Panetti* and *Madison* establishing the threshold showing. Furthermore, the Missouri Supreme Court's decision denying Mr. Johnson a fair hearing to assess his incompetence and finding he did not meet the required "substantial threshold" to show incompetence, while at the same time making credibility

49

determinations and resolving factual disputes, was contrary to and an unreasonable application of the clearly established federal law set forth in *Ford* and *Panetti*. 551 U.S. at 948 ("We agree with petitioner that no deference is due. The state court's failure to provide the procedures mandated by *Ford* constituted an unreasonable application of clearly established law as determined by this Court.").

Just as troubling, the Missouri Supreme Court's erroneous factual finding that the medical records did not contain references to the kinds of delusions noted by Dr. Agharkar, and its reliance on the affidavit of an employee of the Respondent who was unqualified to assess Mr. Johnson's competency, render its decision unreasonable in light of the evidence presented. Thus, § 2254(d) does not bar review of Mr. Johnson's claim and this Court should apply *de novo* review.

> **1.    The Missouri Supreme Court's decision was contrary to or an unreasonable application of clearly established federal law.**

The Missouri Supreme Court's decision was contrary to and an unreasonable application of the Supreme Court's holdings in *Ford* and *Panetti*, which require a "fair hearing" after the prisoner has made a "substantial threshold showing of insanity." *Panetti*, 551 U.S. at 949. The Supreme Court has held that "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 406 (O'Conner, J., for majority). The Court further held: "A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and

50

nevertheless arrives at a result different from our precedent." *Id.* A state court decision is objectively unreasonable when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . ." *Id.* at 407-08.

Here, the state court confronted a set of facts that are materially indistinguishable from at least two decisions of the Supreme Court and arrived at a result different from the Court's precedent. In *Panetti* itself, the Supreme Court ruled the state court "failed to provide petitioner with a constitutionally adequate opportunity to be heard" after the court appointed examiners to evaluate the petitioner and then denied his competency claims without a hearing. *Id*. at 952. There, the petitioner had submitted "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row on February 3, 2004." 551 U.S. at 935, 938. The Court held that submission to be sufficient to establish the requisite "substantial threshold showing," necessitating further process to determine the ultimate competency question. *Id.* at 950.

Likewise, in *Madison*, the Supreme Court ruled the evidence submitted by the petitioner—two affidavits from his legal team and references to medical records— sufficient to establish a prima facie case of incompetency. 139 S. Ct. at 718; Petition for Suspension of Mr. Madison's Death Sentence Pursuant to Alabama Code § 15-16-23 Because He Is Incompetent to be Executed, *Madison v. State of Alabama,* No. CC-85-1385.80 (Ala. Cir. Ct. Feb. 12, 2016). Thus, as in *Madison* and *Panetti*, the evidence Mr. Johnson submitted to the Missouri Supreme Court—the report of a neuropsychiatrist who conducted an extensive evaluation of Mr. Johnson, along with voluminous medical and

mental health records reflecting the same kinds of delusions and irrational understandings Mr. Johnson reported to Dr. Agharkar—was plainly sufficient to establish the required threshold showing.

Furthermore, the Missouri Supreme Court's decision to the contrary rests on such circular logic that it renders the requirements of *Ford* and *Panetti* meaningless. The court concluded Mr. Johnson failed to make a threshold showing only after it engaged in factual analysis (which were erroneous) and credibility determinations (based on false factual premises) it was not in a position to make. The court decided the competency issue on the merits, based on a record that was intended only to establish the threshold showing necessary, and then used its merits decision to say Mr. Johnson had not met the necessary threshold.[3]

But as Justice Powell noted in *Ford*, "the competency determination depends substantially on expert analysis in a discipline fraught with subtleties and nuances." *Ford*, 477 U.S. at 426 (internal quotation marks omitted). Moreover, "[t]he appropriate means of deciding credibility and factual determinations . . . is an evidentiary hearing." *Cole v. Roper*, 783 F.3d 707, 717 (8th Cir. 2015) (Bye, J., dissenting) (citing *Franco v. United States*, 762 F.3d 761, 765 (8th Cir. 2014) (the district court abused its discretion in finding one affidavit more credible than the other without the benefit of an evidentiary hearing)); *see also Thompson v. Bell*, 580 F.3d 423, 435 (6th Cir. 2009) ("As *Panetti*

---

[3] In making this argument regarding the Missouri Supreme Court's blatant error of law, by no means does Mr. Johnson concede that the Missouri Supreme Court accurately considered the evidence before it. As explained below, the Missouri Supreme Court failed to consider and address evidence that conflicted with its desired result.

makes clear, the state courts' dismissal of Thompson's petition without conducting an evidentiary hearing was an unreasonable application of *Ford*'s tenets.").

The Missouri Supreme Court's method of assessing whether violated Mr. Johnson satisfied the threshold incompetency standard was fundamentally unfair. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). The court's engagement in fact-finding and credibility determinations without allowing a hearing to test the evidence submitted by both sides deprived Mr. Johnson of due process. No court has ever heard testimony about Mr. Johnson's incompetence, and he has never had an opportunity to confront the State's evidence (other than in his reply brief to the Missouri Supreme Court). Furthermore, though Missouri provides the right to petition for rehearing, in this case, the court preemptively—and without explanation—denied that right to Mr. Johnson.

The Missouri Supreme Court's circular conclusion that Mr. Johnson had not met the threshold showing of incompetency, thus merging and muddling the proper method of addressing incompetency claims laid out by the Supreme Court in *Ford* and *Panetti*, demonstrates that its decision was contrary to and an unreasonable application of clearly established Supreme Court law. The decision is not entitled to any deference from this Court.

### 2.     The Missouri Supreme Court's decision was also based on an unreasonable determination of the facts in light of the evidence.

In denying Mr. Johnson's state habeas petition, the Missouri Supreme Court referenced and made credibility findings regarding the affidavit of Ashley Skaggs, a therapist at Potosi Correctional Facility, whose observations of Mr. Johnson it deemed more credible than the competency evaluation and report by Dr. Agharkar, a licensed psychiatrist who reviewed Mr. Johnson's extensive medical and mental health records and spent two hours and 40 minutes evaluating him. The court concluded that Skaggs's affidavit and the State's rendition of Mr. Johnson's medical and mental health records refuted Mr. Johnson's evidence of incompetency, stating that the medical records "do not include a single mention of the type of delusions Agharkar alleges." *State ex rel. Johnson v. Vandergriff* at 8, n.7. This conclusion is an unreasonable determination of fact. Contrary to what the Missouri Supreme Court found, as further detailed below, the records contain at least 15 mentions of the types of delusions Mr. Johnson expressed to Dr. Agharkar in the two-hour-and-40-minute evaluation he conducted, which was more than double the cumulative amount of time Ashley Skaggs spent with Mr. Johnson between 2021 and May 10, 2023, when the records end—a total of, at most, 75 minutes.

Moreover, Skaggs's licensure and training do not qualify her to assess an individual's competency to be executed. Her conclusion that Mr. Johnson "appears to understand the nature of his upcoming execution," Resp. R.91 Ex. D (Skaggs Affidavit) at 2, is not the correct legal standard for a competency determination. Nor does Skaggs explain the basis for her conclusion. Nothing in the affidavit explains that the purpose of

Skaggs's "regular" contact with Mr. Johnson is anything other than to "check in and assess his mental health needs" or explains the types of questions she asks him, if any, during those meetings. *Id.* at 1. The Missouri Supreme Court also failed to acknowledge or address the serious violation of Skaggs's ethical duties her affidavit presents, given her dual role as a witness for the State in support of Mr. Johnson's execution as well as "provid[ing] care" and mental health treatment to him, nor the due process violation arising out of the denial of a competency claim based on an affidavit unquestionably tainted by her clear conflict of interest. For all these reasons, the Missouri Supreme Court's denial of Mr. Johnson's competency claim was based on an unreasonable—and plainly erroneous—determination of the facts in light of the evidence presented to the court.

> i.     **The Missouri Supreme Court's cursory review of Mr. Johnson's medical records failed to account for the numerous mentions of the types of delusions he reported in the competency evaluation by Dr. Agharkar.**

The Missouri Supreme Court's decision was based on an unreasonable determination of fact and was simply wrong. Contrary to the Missouri Supreme Court's statement, Mr. Johnson's medical records reflect that throughout his incarceration, he has endorsed similar types of delusions about being a vampire, not being able to be killed, being from another realm or world, spiritual warfare and demons, and other irrational beliefs to mental health staff as he did to Dr. Agharkar during his competency evaluation. In one sense, the Missouri Supreme Court was correct that there is not a "single" such

reference in the records – there are, in fact, at least 15 such references over the last two decades.

On July 30, 2002, while Mr. Johnson was incarcerated at the St. Louis County Justice Center, a nurse noted he was "crying and fearful," and he reported that he saw "demons." Pet. R.91 Ex. 14 at 31. **(#1).** On December 29, 2003, he reported seeing "shadow people that seem to come out of cracks." Pet. R.91 Ex. 16 at 25. **(#2).**

On August 25, 2004, Mr. Johnson told mental health staff that he saw demons and stated, "I am not from this dimension. – I was born in this world. But my soul is from a different world." Resp. R.91 Ex. C at 39. He also stated, "I can't leave my army-of-demons. A murder charge is pending. I'm pushing for the death penalty, so that I can cross over- to demon's world." *Id.* **(#3).** On November 4, 2004, he reported having "demonic dreams with dead people and flames." *Id.* at 42. He heard screams in his head, "like when someone shoots into a crowd," and called one of the voices he was hearing "Leviathan." *Id.* **(#4).** On November 19, 2004, he was seen banging his head on his cell door and scratching himself to draw blood. *Id.* at 45; Pet. R.91 Ex. 9 at 235. He wrote on his cell walls, "I'm the Dead." Pet. R.91 Ex. 9 at 235. **(#5).**

On March 17, 2005, Mr. Johnson reported having nightmares of dead people coming to get him. Resp. R.91 Ex. C at 58. **(#6).** Nearly two weeks later, after cutting himself with a razor, discussing suicidal ideations, and telling staff that the voices were telling him to cut his arm off, on March 29, 2005, Mr. Johnson "had written 'die' in feces on the window to the cell. Had also written 'were dead' on the wall in feces" and in blood

56

and he had removed the bandages from his wounded arms and smeared feces in the wounds." *Id.* at 60, 64. **(#7).**

After swallowing razor blades in a suicide attempt on July 13, 2006, a staff member reported that Mr. Johnson "was talking like he was someone else who was trying to kill 'Johnny'." *Id.* at 86. The staff member continued, "I could not understand who he said he was, but he kept talking about telling Johnny what to do and Johnny wouldn't do it." **(#8).** On June 10, 2008, Mr. Johnson again reported hearing a "demonic voice." *Id.* at 139. **(#9).**

Mr. Johnson's delusions about being the "Seventh Sign" and about his death causing the end of the world—beliefs he reported to Dr. Agharkar—have reoccurred and are reflected in the medical records, contrary to the Missouri Supreme Court's forced findings. On February 17, 2004, Dr. Dean reported that during her four-day evaluation of Mr. Johnson, he "expressed the belief that 'when I was born the world was created, and when I die the world will die.'" Pet. R.91 Ex. 19 at 9. **(#10).** Again, on January 21, 2005, Mr. Johnson told a prison psychiatrist, "I think I'm the 7th sign. I'm the end of the world when I die." Resp. R.91 Ex. C at 48; Pet. R.91 Ex. 16 at 55. **(#11).** Years later, on February 13, 2020, the medical records reflect that Mr. Johnson reported to the doctor that he heard voices and said, "sometimes I think that the world will end if I die." Resp. R.91 Ex. C at 463. **(#12).** In a similar vein, on May 7, 2020, Mr. Johnson reported hearing "male/female voices inside his head telling him that people talk about him, the end of the world, he is God etc. [sic]." *Id.* at 470. **(#13).**

On September 22, 2022, Mr. Johnson informed the psychologist he had auditory hallucinations of voices telling him "the world is going to end." *Id.* at 567-68. He reported having auditory hallucinations on a "regular basis" and "has heard God's voice talking directly to him and sometimes he 'can hear the other side of the world and different spirits.'" *Id.* He also reported, "I can close my eyes and see into somebody else's eyes," which he told the psychologist was his "power" even though he also said he knew it was not real. *Id.* The psychologist noted that Mr. Johnson's "[t]hought content evidenced some grandiosity, paranoia, and ideas of reference." *Id.* at 569. **(#14).**

Likewise, Mr. Johnson's delusions of being a vampire are noted in his medical records well before Dr. Agharkar's evaluation took place. On September 24, 2021, Mr. Johnson was placed on suicide watch after reporting he was a vampire. *Id.* at 527. A few hours after he was placed on suicide watch, Mr. Johnson stated, "I am not suicidal. I am vampire. I have been one for awhile [sic]. I am hearing everubodu [sic] in the camp. I found about the machine. It is everybody. I want to have some regular clothes. I am not suicidal." *Id.* at 527-28. During another evaluation the same day, mental health staff reported that Mr. Johnson "explained that he was on suicide watch due to realizing he was vampire, which he substantiated by noting he can 'flex my eyes' and manipulate his bones/back as well." *Id.* at 529. He also reported he could "'hear the whole camp at one time' which he confirmed was overwhelming." *Id.* Despite being "compliant with medications," the content of Mr. Johnson's speech "was dominated by delusional themes of being a vampire" and "he appeared to be distracted by internal stimuli, which was

evidenced by delays in responding." *Id*. Mr. Johnson also reported having auditory hallucinations "and reminded me frequently of being a vampire." *Id.* **(#15).**

Because the records obviously contain multiple references to Mr. Johnson's delusional beliefs, the Missouri Supreme Court's statement that Mr. Johnson's medical records "do not include a single mention of the type of delusions" Dr. Agharkar reported is therefore based on an unreasonable, and clearly erroneous, review of the factual record. Themes of being "the Dead," "the end of the world," a vampire, and of being involved in spiritual warfare, pervade Mr. Johnson's medical records, even while he has been compliant with his medications. Critically, they predate the setting of the execution date by decades—there is no plausible doubt of their persistence and presence for over twenty years. This Court does not owe any deference to the Missouri Supreme Court's decision.

### ii. The Missouri Supreme Court's reliance on and credibility finding regarding the affidavit supplied by Ashley Skaggs were unreasonable in light of the totality of the evidence.

The Missouri Supreme Court's reliance on the affidavit provided by Ashley Skaggs, and its suggestion that her opinion as to Mr. Johnson's competency was more credible than that offered by Dr. Agharkar, further signifies the unreasonableness of the court's determination of the facts in light of the evidence. Skaggs's affidavit misstated and was inconsistent with Mr. Johnson's records, including her own notes of her encounters with him, and she vastly overstated the nature and depth of her contact with Mr. Johnson—misstatements the Missouri Supreme Court then repeated in its majority opinion.

Skaggs's claim that Mr. Johnson "has never expressed" the kinds of hallucinations or delusional beliefs during her visits that he expressed to Dr. Agharkar is misleading at best. Regardless of what he has expressed to Skaggs individually, as previously noted, his records are peppered with reports of such hallucinations and delusions. Notably, for example, Skaggs's visit with Mr. Johnson on September 27, 2021, was a follow-up to the incident during which Mr. Johnson was placed on suicide watch because of his belief he was a vampire.[4] Resp. R.91 Ex. C at 532. Although Mr. Johnson apparently did not voice his belief that he was a vampire to Skaggs herself at that time, based on her notes, the implication in her affidavit that he has only endorsed such beliefs to Dr. Agharkar in recent months was untrue, as he had voiced that belief to mental health staff multiple times a mere three days before she saw him. *Id.* at 528-29; Resp. R.91 Ex. D at 1. Mr. Johnson was still on suicide watch because of that incident when Skaggs first met with him. Resp. R.91 Ex. C at 532.

It is nonsensical to believe that she was unaware as to the **why** she was doing follow-up with Mr. Johnson. If she was aware, then her affidavit is rebutted by the records. To the extent she did not know of the suicide risk due to the vampire delusion, her incompetence in this regard is a basis to discount her affidavit—it demonstrates her lack of credibility and professionalism—a person purportedly treating Mr. Johnson, who is clueless as to his current mental health status.

---

[4] Skaggs's affidavit states that she began working at Potosi Correctional Center in 2021 and that she has treated Mr. Johnson since then. Resp. R.91 Ex. D at 1. However, the medical records reflect that she met with him for five minutes on April 23, 2017. Resp. R.91 Ex. C at  401-02.

According to Skaggs's notes during that visit, Mr. Johnson's "baseline" was to hear voices even though he was taking his medications, contrary to Skaggs's claim in her affidavit that his hallucinations are "managed by medication." *Id.*; Resp. R.91 Ex. D at 1. She wrote that Mr. Johnson "did not appear to be responding to internal stimuli and did not display bizarre thinking," but three days later, on September 30, 2021, during his chronic care encounter, he reported to another mental health provider that he was "still having AH [auditory hallucinations] all the time. It is like a constant humming in my head. It is more than one voice. They call my name out and doors slamming all the door [sic]." Resp. R.91 Ex. C at 532. He was taking his medications, but his hallucinations felt "worse[,]" and he did not think the medications were working. *Id.* On October 4, 2021, although Mr. Johnson was taking his medications, he reported, "I am still hearing voices." *Id.* at 534. While he was not having auditory hallucinations during the interview, he stated, "It seems to be all the time." *Id.* On October 7, 2021, Mr. Johnson was compliant with his medications and was still experiencing auditory hallucinations "[o]nce a day and it is whispers." *Id.* at 536.

At his December 7, 2021, appointment with the psychiatrist, Mr. Johnson reported that the increase in his medications "helped some" but he was still experiencing paranoia and "voices in head," and the psychiatrist reported "hallucinations present." *Id.* at 540. At an appointment with a mental health tech that same day, he reported, "I have some problems with the voices again" and although he reported being "able to manage them," he also said the medication "is not helping." *Id.* at 542. His auditory hallucinations were still occurring daily. *Id.*

61

On September 22, 2022, Mr. Johnson was seen by a psychologist for his annual mental health assessment. In that evaluation, although Mr. Johnson apparently stated that he believed his medications were effective, he also informed the psychologist he had auditory hallucinations of voices telling him "the world is going to end." *Id.* at 567-68. He reported having auditory hallucinations on a "regular basis" and "has heard God's voice talking directly to him and sometimes he 'can hear the other side of the world and different spirits.'" *Id.* He also believed "the TV has communicated directly with him in the past" and believed "he was a famous singer once in the past." *Id.* He reported he did not get visits from family because his mother, son, grandmother, aunts, and uncles died from COVID. *Id.*[5] He also reported, "I can close my eyes and see into somebody else's eyes." *Id.* While he informed the psychologist that he knew it was not real, he also reported that this ability is his "power." *Id.* The psychologist reported in the records that Mr. Johnson did not appear to be responding to "unseen stimuli" during the encounter, but he endorsed regular auditory hallucinations and his "[t]hought content evidenced some grandiosity, paranoia, and ideas of reference." *Id.* at 569.

A little over a month later, on October 26, 2022, Mr. Johnson met with mental health staff for a "crisis intervention" because he had been "talking to himself, yelling at his tablet and waking up yelling at night." *Id.* at 574. His cellmate had not slept for three

---

[5] While Mr. Johnson's mother is deceased and may have died from complications due to COVID, his son, grandmother, and other relatives are still alive. Relatives and friends (who are alive) having died is a recurring delusion for Mr. Johnson. *See, e.g.,* Resp. R.91 Ex. C at 124 (Mr. Johnson reported to the psychiatrist that he was "hearing voices again telling him that his family is dead.").

days because he was concerned Mr. Johnson would "spas [sic] out." *Id.* Mr. Johnson's auditory hallucinations had increased after his medication was changed and he described them "like a conversation occurring." *Id*. He had apparently been yelling about "aliens and robots," although Mr. Johnson stated he had been singing. *Id.* Importantly, the mental health staff member who interviewed Mr. Johnson during this encounter wrote, "It is believed that offender may be minimizing his symptoms and things bothering him" and the mental health staff decided he should be placed on close observation. *Id.* at 575.

At his follow-up appointment with the psychiatrist on October 28, 2022, Mr. Johnson reported that his auditory hallucinations "are like a voice just inside his ear" and "they are always at least a mumble in the background, get worse when he is stressed." *Id.* at 576. He had been "talking to aliens" in the middle of the night, although Mr. Johnson apparently did not remember doing this. *Id.* In the appointment, Mr. Johnson informed the psychiatrist that he was concerned his medication was not working and did not remember any medications helping except Klonopin, which he had taken while in St. Louis County jail but was not an option in his current facility. *Id.* On November 8, 2022, the doctor noted that Mr. Johnson "denie[d] . . . talking to aliens." *Id.* at 582.

Skaggs's notes in Mr. Johnson's medical records also reveal repeated internal inconsistencies-all of which were ignored by the Missouri Supreme Court and all of which would be fertile grounds for cross-examination of her unqualified opinion. In her notes from encounters with Mr. Johnson on February 2, 2023, March 8, 2023, May 4, 2023, and May 10, 2023, she wrote, "Offender has a history of auditory hallucinations. He reports none since taking medication." *Id.* at 590, 594, 599, 602. Yet on January 23,

2023, Skaggs noted that Mr. Johnson "said he's doing better and is hearing **less** voices." *Id.* at 588 (emphasis added). Hearing **less** does not come close to **none**. Although on February 2, 2023, Skaggs noted that Mr. Johnson reported that he did not have hallucinations while on medication, on March 8, 2023, she also noted that Mr. Johnson reported that "the voices are still **'a whisper' and at baseline**," reflecting that he does indeed experience auditory hallucinations while compliant with his medications. *Id.* at 590, 594 (emphasis added).

Likewise, on May 10, 2023, Skaggs noted that Mr. Johnson "reports he is now having minor auditory hallucinations. He described them as laughing or chattering in his ear." *Id.* at 601. Another note from the same day states that Mr. Johnson was "having issues with sleep" and reported "mild AH [auditory hallucinations] of 'chattering and laughing.'" *Id.* at 602. But Skaggs's notes from both March 8 and May 10 also state, "Offender has a history of auditory hallucinations. He reports none since taking medication." *Id.* at 594, 602. Given that Mr. Johnson reported auditory hallucinations that very day even while taking medication, Skaggs's note was erroneous—as is the claim in her affidavit that Mr. Johnson's symptoms are managed by medication and the implication that they will continue to be so managed going forward. Resp. R.91 Ex. D at 1-2.[6] And although Mr. Johnson reported these increased hallucinations starting a few weeks before this encounter, the totality of his medical records establishes that while the

---

[6] This is the opinion of a person with a master's in psychology. She simply is not qualified to discuss this matter. A medical doctor, who prescribes the medicine and knows why the medicines are prescribed, is the source for such an opinion.

magnitude and intensity of his hallucinations may fluctuate over time, they are a regular

presence in his life even while he is on medication. Resp. R.91 Ex. C at 594, 602.[7]

In addition to the inconsistencies between Skaggs's affidavit and the medical

records, as well as the inconsistencies within Skaggs's own notes in the records, the

amount of time she has spent with Mr. Johnson casts serious doubt on her ability to

accurately assess or observe the content or intensity of his hallucinations and delusions.

Although she claimed in her affidavit to see Mr. Johnson "regularly" and stated she has

treated him "off and on" since 2021, the records demonstrated that she has met with him

on a total of eight dates, for a total of approximately one hour, between 2021 and May 10,

2023. *See* Resp. R.91 Ex. D at 1.[8] The only time Skaggs saw Mr. Johnson in 2021 was on

---

[7] The fact that Mr. Johnson's medical records reveal he has been treated with at least 37
medications throughout his time in the correctional system also calls into question
Skaggs's nonsensical claim that Mr. Johnson's symptoms are adequately managed by
medication. Resp. R.91 Ex. C at 1-3, 6-7, 1, 14-16, 30, 42, 44, 49, 55, 62, 65, 71, 79, 87,
95-96, 111, 124-26, 489, 500, 549, 574; Pet. R.91 Ex. 1 at 18-21.

[8] Two of the meetings do not indicate what time they took place or how long they lasted.
Without those two meetings, Skaggs met with Mr. Johnson for a total of 55 minutes.
Each meeting was between five and ten minutes. Assuming the two encounters without
duration information lasted ten minutes each—the maximum amount of time she ever
spent with Mr. Johnson—Skaggs would have spent a total of 75 minutes with Mr.
Johnson since 2021. Their 2017 encounter was five minutes long. Resp. R.91 Ex. C at
401.

Until the afternoon of June 29, 2023, Mr. Johnson's legal team did not have access to his
medical records for dates later than May 10, 2023. In fact, Mr. Johnson's counsel had
only received from DOC his records until November 16, 2023. Despite requesting these
records at least six times, including three requests for records from November until now
(after receiving only three weeks' worth of additional records in April 2023), DOC did
not provide them until the afternoon of June 29, 2023, **after the conclusion of Mr.
Johnson's state habeas proceedings**. The only reason Mr. Johnson previously had any
access to the records between November 16, 2023 and May 10, 2023, was because the

September 27, after he was placed on suicide watch and reported realizing he was a

vampire; all the other mental health appointments in his records that year were with other

individuals. The September 27 meeting lasted five minutes, from 8:40 to 8:45 am. Resp.

R.91 Ex. C at 530.

Skaggs saw Mr. Johnson once in 2022, on July 7, 2022. *Id.* at 559-60. According

to the records, the visit lasted ten minutes, from 1:35 to 1:45 pm, and it was an evaluation

pursuant to the Prison Rape Elimination Act ("PREA") because Mr. Johnson had

reported his cellmate made sexual comments to him and they got into a physical

altercation. *Id.* at 560.

Skaggs's next meeting with Mr. Johnson was on January 23, 2023, for ten

minutes, from 1:40 to 1:50 pm. *Id*. at 588. Their subsequent encounter, on February 2,

2023, does not note the time. *Id.* at 590. On February 21, 2023, Skaggs was unable to

meet with Mr. Johnson because he was at a medical appointment, and on February 24,

2023, and March 1, 2023, the notes indicate they were not able to meet because of time

constraints. *Id.* at 593. At the next encounter, on March 8, 2023, they again met for ten

minutes, from 12:35 to 12:45 pm. *Id.* at 594. Skaggs was present on April 20, 2023, when

Mr. Johnson was read the death warrant, and the notes indicate another ten-minute

encounter, from 11:10 to 11:20 am. *Id.* at 596. They met for five minutes at Mr.

---

warden provided them to the Attorney General, apparently without any difficulty at all,
and submitted them with his response to Mr. Johnson's state habeas petition.

The warden's failure to provide Mr. Johnson's medical records in a timely manner
evidences the conflict of interest in providing medical care to Mr. Johnson while at the
same time actively working against his incompetency claim.

Johnson's cell door on May 4, 2023, from 9:05 to 9:10 am. Their May 10, 2023 meeting lasted five minutes, from 3:15 to 3:20 pm, and another note from the same day has a time stamp of 3:30 pm, but does not indicate how long that encounter lasted. *Id.* at 601-02.

In contrast with the amount of time Skaggs has spent with Mr. Johnson—at most, 75 minutes between 2021 and May 10, 2023—Dr. Agharkar evaluated Mr. Johnson for two hours and 40 minutes (i.e. 160 minutes)—more than double the amount of time Skaggs has spent with him in total. Pet. R.91 Ex. 1 at. 2. While the evaluation occurred on one date, Dr. Agharkar—a licensed psychiatrist with experience conducting competency evaluations—performed an in-depth evaluation of Mr. Johnson, in a private visiting room, after thoroughly reviewing hundreds of pages of medical and mental health records as well as case-related documents. Dr. Agharkar conducted a neuropsychiatric examination of Mr. Johnson, including evaluating for possible malingering, in addition to asking Mr. Johnson questions about his understanding of the reasons for his execution. *Id.* 50-55.

In this regard the Missouri Supreme Court unreasonably relied on "her regular assessments" and that she "met regularly" as contrasted by a "single clinical interview" and a "single meeting" that Dr. Agharkar had with Mr. Johnson. *State ex rel. Johnson v. Vandergriff,* at 5-8. This unreasonably creates the misperception that Skaggs spent much more time with Mr. Johnson than Dr. Agharkar. It simply is not true. Dr. Agharkar, a medical doctor, spent twice as much time with Mr. Johnson than Skaggs did in her drive-by counseling assessments (two times she ran out of time to do even the drive-by). That it is "a regular assessment" that a schizophrenic receives less amount of time over three

67

years than the time it takes to watch a Cardinals game in a single evening says more about the pathetic nature of the mental health services provided by Missouri corrections than it does the accuracy of Skaggs's improper and unqualified opinion. The Missouri Supreme Court unreasonably characterized the extent of Skaggs's contact with Mr. Johnson in making an unfair comparison—when the medical records documented the time she actually spent with Mr. Johnson.

Skaggs, in contrast to Dr. Agharkar, is a licensed professional counselor with a master's degree in psychology who has met with Mr. Johnson, generally at his cell door, for five- to ten-minute intervals on nine occasions over three years. There is no indication what, if any, experience she has with legal claims of incompetency to be executed, or even with truly delusional and psychotic patients. Her understanding of the legal standard is incorrect, based on the language in her affidavit, and nothing in it suggests she has ever reviewed any of Mr. Johnson's extensive medical or mental health records or considered what he has reported to other mental health providers at the prison about his delusions. In fact, the affidavit is completely bare of any information suggesting she would be qualified to offer an expert opinion on the issue of incompetency to be executed, and even if she had the professional qualifications to do so, her surface-level, brief, and sporadic interactions with Mr. Johnson surely would not provide the quality of assessment that Dr. Agharkar's in-depth evaluation provides.

In any event, under Missouri law, Skaggs does not possess the necessary qualifications to render an expert opinion on whether Mr. Johnson is incompetent to be executed due to his mental disorders. Mo. Rev. Stat. § 337.015.1 ("No person shall

68

engage in the practice of psychology in the state of Missouri unless he is validly licensed and registered under the provisions of this chapter . . . ."); Mo. Rev. Stat. § 337.500 (not permitting a counselor to diagnose). In 2001, the Supreme Court of Missouri ruled that "'professional counseling' and 'practice of professional counseling' . . . are not defined to include 'diagnoses' of any sort[.]" *Johnson v. State*, 58 S.W.3d 496, 499 (Mo. banc 2001) (quoting Mo. Rev. Stat. § 337.500). The Eastern District Court of Appeals similarly held, relying on Mo. Rev. Stat. § 337.500 and *Johnson*, that a licensed professional counselor is not qualified to render an option that a patient suffered from post-traumatic stress disorder. *State v. Montgomery*, 64 S.W.3d 328, 333-34 (Mo. App. E.D. 2001).

Thus, the Missouri Supreme Court's determination that Mr. Johnson's evidence "lacks credibility" in light of the State's evidence, negatively comparing Dr. Agharkar's "single meeting" with Mr. Johnson to Skaggs's "regular assessments" of his mental health since 2021, was plainly unreasonable. *State ex rel. Johnson v. Vandergriff,* at 8. Previously, the Missouri Supreme Court rejected purported expert testimony when it did not come from someone who was "not certified or licensed as a psychologist or psychiatrist." *Goodwin v. State*, 191 S.W.3d 20, 33 (Mo. banc 2006). Skaggs is neither a certified or licensed psychologist or psychiatrist. It was unreasonable to ignore this principle of Missouri law, relying on an unqualified person for a forensic competency opinion.

Skaggs's misstatement of the legal standard for competency to be executed further demonstrates the impropriety of the Missouri Supreme Court's reliance on her affidavit. Her statement that Mr. Johnson "appears to understand the nature of his upcoming

execution" misstated the legal standard set forth by the Supreme Court as to competency to be executed. Resp. R.91 Ex. D at 2. Awareness of the nature of the execution is not the same thing as a rational understanding of the reason for the execution, which both the United States Supreme Court and the Missouri Supreme Court have plainly recognized. *Panetti*, 551 U.S. at 956-57; *Madison*, 139 S. Ct. at 723; *State ex rel. Middleton v. Terry Russell*, 435 S.W.3d 83, 85 (Mo. banc 2014) (citing the *Panetti* Court's finding that the petitioner met the threshold incompetency standard because "even though "petitioner claims to understand 'that the state is saying that [it wishes] to execute him for [his] murder[s],' he believes in earnest that the stated reason is a 'sham' and the State in truth wants to execute him 'to stop him from preaching.'"); *Clayton v. Griffith*, 457 S.W.3d 745 (Mo. banc 2015) ("*Panetti* allows for the possibility that an inmate may admit that—according to his jailers—he is to be executed for some criminal act even though he actually is laboring under the genuine (albeit delusional) belief that he is going to be executed for some different, likely bizarre, but utterly unrelated reason.").

Even in its decision in this very case, the Missouri Supreme Court rejected Respondent's argument that Mr. Johnson's understanding of the nature of his execution meant he rationally understands the reason for it. *State ex rel. Johnson v. Vandergriff*, at 6 ("Johnson's awareness of the State's rationale for his execution should not end the inquiry as to whether he has a rational understanding of the reason for his penalty."). Yet inexplicably, despite that acknowledgement, the court nevertheless relied on Skaggs's claim that Mr. Johnson "appears to understand the nature of his execution," as well as notations in the medical records indicating Mr. Johnson felt remorse for having

70

committed the offense and was pursuing appeals in his legal case, to support its conclusion that Mr. Johnson did not establish a substantial threshold showing of incompetence. *Id.* But neither Mr. Johnson's purported understanding of the "nature of his execution," nor his remorse for committing the offense or pursuit of legal remedies through his attorneys, negate the fact that he believes the reason for his execution is that Satan is using the State of Missouri to end the world. The Missouri Supreme Court's determination to the contrary, based on Skaggs's incorrect understanding of the legal standard, was unreasonable in light of the totality of the evidence presented to the court.

Finally, Skaggs's provision of an affidavit in support of Mr. Johnson's competency to be executed violated National Commission on Correctional Health Care ("NCCHC") professional standards and creates an improper conflict of interest, and the Missouri Supreme Court's reliance on it violated Mr. Johnson's right to due process. NCCHC has determined that "the issue of 'fitness for execution' has become a problem for correctional institutions[.]" Pet. R.91 Ex. 22 (NCCHC, Position Statement, Competency for Execution (reaffirmed October 2022)). The NCCHC recognized that the "U.S. Supreme Court has upheld the principle observed in the separate states that a mentally incompetent inmate should not be executed, and has further said that archaic means of making such determinations should be corrected." *Id.* The NCCHC further acknowledged that "participation in this area by health care professionals continues to be fraught with difficulties stemming from unclear legal guidelines, lack of specific due process procedures, and issues of conflict of interest." *Id.* Due to these problems, the NCCHC's professional "standards require that the determination of whether an inmate is

71

'competent for execution' should be made by an independent expert and not by any health care professional regularly in the employ of, or under contract to provide health care with, the correctional institution or system holding the inmate." *Id.*

As the Institutional Chief of Mental Health at the Potosi Correctional Center, Skaggs is "a health care professional regularly in the employ of, or under contract to provide health care with, the correctional institution or system holding the inmate." Pet. R.91 Ex. 22. In this role, she should not "be involved in deciding if a death row inmate is "competent for execution[.]'" *Id.* Her involvement unfairly creates a clear conflict of interest, pitting her loyalty to Mr. Johnson of providing necessary health care to him versus her loyalty to her employer, who seeks to have this Court deem Mr. Johnson fit for execution. Moreover, Mr. Johnson has not been informed of this conflict or how it affects his medical care. Skaggs's affidavit does not contain any assertion that she has informed Mr. Johnson that in addition to her role as providing medical care to him, she also is involved in deciding whether he is competent for execution. *Id.*[9] Thus, Skaggs's provision of the affidavit is in blatant disregard of the NCCHC professional standards, and the Missouri Supreme Court's reliance on Skaggs's conflict-laden opinion to deny Mr. Johnson's competency claim, violated Mr. Johnson's right to due process.

---

[9] Nor did Respondent or Skaggs inform or provide any notice to Mr. Johnson's counsel that Skaggs would be involved in the determination of whether Mr. Johnson is competent for execution. The Attorney General's Office also failed to notify counsel or request permission for its agent to speak with Mr. Johnson, an individual represented by counsel, for the purposes of assessing his competency to be executed.

## CONCLUSION

For all the foregoing reasons, this Court does not owe any deference to the Missouri Supreme Court's decision. This Court should apply *de novo* review and find that Mr. Johnson made a substantial threshold show of incompetency and hold an evidentiary hearing, in accordance with the Supreme Court's procedure set forth in *Panetti* and with the requirements of due process, to assess his claim of incompetence to be executed. Mr. Johnson further requests this Court to issue a writ of habeas corpus, vacate his sentence of death, and grant any other relief this Court deems just.

Respectfully submitted,

/s/ Kent E. Gipson
KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 E. Gregory Blvd.
Kansas City, MO 64114
816-363-4400 • Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

/s/ Daniel E. Kirsch
Daniel E. Kirsch, E.D. Mo. Bar No. 57022MO,
Mo. Bar No. 57022
Meredith Schlacter, Ny. Bar No. 5321625
Laurence E. Komp, Mo. Bar. No. 40446
Mandi Schenley, Oh. Bar No. 0102596
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-471-8282
daniel_kirsch@fd.org
meredith_schlacter@fd.org
laurence_komp@fd.org
mandi_schenley@fd.org

Attorneys for Petitioner

73

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2022, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system. Through cooperation of the CM/ECF system, I hereby provide to all of counsel of record notice of this filing and the ability to view and download the foregoing pleading.

/s/ Daniel E. Kirsch
Daniel E. Kirsch

## Index of Exhibits

**Exhibit 1: Petition for Writ of Habeas Corpus and Exhibits, *Johnson v. Vandergriff*, No. SC100077 (Mo.)**

| | |
|---|---|
| 1 | Report of Dr. Bhushan Agharkar |
| 2 | St. John's Mercy Health Center Birth records |
| 3 | 2003-10-08 Memo of Interview of Connie and Greg Kemp, Eric Johnson, Katie Johnson, and Lillie Owens |
| 4 | 2003-03-03 Memo of Trial Interview of Connie Kemp and Katie Johnson |
| 5 | Meacham Park Clinic records |
| 6 | Educational records |
| 7 | 2003-03-14 St. John's Mercy records |
| 8 | Johnny Johnson miscellaneous records |
| 9 | Jail and prison records |
| 10 | Missouri Department of Corrections Medical records |
| 11 | 2004-05-10 Des Peres Hospital records |
| 12 | 2003-04-07 Missouri Department of Mental Health records |
| 13 | Report of Dr. John Rabun |
| 14 | 2003-01-24 St. Louis County Justice Center Medical records |
| 15 | 2007-05-14 Potosi Correctional Center Mental Health records |
| 16 | Missouri Department of Corrections Mental Health records |
| 17 | 2022-10-31 Medical History records |
| 18 | Reports of Becker and English |
| 19 | Report of Dr. Delany Dean |
| 20 | Report of Drs. Gordon and Kraushaar |

**Exhibit 2: Petitioner's Motion for a Stay of Execution, *Johnson v. Vandergriff*, No. SC100077 (Mo.)**

**Exhibit 3: Respondent's Suggestions in Opposition to Petitioners Petition for Writ of Habeas Corpus and Exhibits, *Johnson v. Vandergriff*, No. SC100077 (Mo.)**

| | |
|---|---|
| A | Trial Transcript, *State v. Johnson*, No. 02CR-3834 |
| B | Johnson's direct appeal brief, *State v. Johnson*, No. SC86689 |

**Exhibit 4: Respondent's Sealed Exhibits, *Johnson v. Vandergriff*, No. SC100077 (Mo.)**

| | |
|---|---|
| C | Johnson's mental health records |
| D | Affidavit |

**Exhibit 5: Petitioner's Reply Suggestions in Support of Petition for Writ of Habeas Corpus,** *Johnson v. Vandergriff*, **No. SC100077 (Mo.)**

| 21 | *State ex rel. Williams v. Steele*, No. SC94720 (orders granting motion for stay and sending the matter to a special master) |
| 22 | NCCHC, Position Statement, Competency for Execution (reaffirmed October 2022) |

**Exhibit 6: Petitioner's Reply Suggestions in Support of Motion for Stay of Execution,** *Johnson v. Vandergriff*, **No. SC100077 (Mo.)**

**Exhibit 7: Missouri Supreme Court Opinion Denying Petition and Overruling Motion to Stay,** *Johnson v. Vandergriff*, **No. SC100077 (Mo.)**

**Exhibit 8: Affidavit of Michael A. Tisius**